# HILL ET AL. *v.* COLORADO ET AL.

No. 98–1856.   Argued January 19, 2000—Decided June 28, 2000

704

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. SOUTER, J., filed a concurring opinion, in which O'CONNOR, GINSBURG, and BREYER, JJ., joined, *post*, p. 735. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 741. KENNEDY, J., filed a dissenting opinion, *post*, p. 765.

*Jay Alan Sekulow* argued the cause for petitioners. With him on the briefs were *James M. Henderson, Sr., Walter M.*

*Weber, Joel H. Thornton, Thomas P. Monaghan,* and *Roger W. Westlund.*

*Michael E. McLachlan,* Solicitor General of Colorado, argued the cause for respondents. With him on the brief were *Ken Salazar,* Attorney General, *Felicity Hannay,* Deputy Attorney General, *Carol D. Angel,* Senior Assistant Attorney General, and *Maureen Herr Juran.*

*Deputy Solicitor General Underwood* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Beth S. Brinkmann, David K. Flynn,* and *Louis E. Peraertz.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Steven R. Shapiro;* for Liberty Counsel by *Mathew D. Staver;* and for People for the Ethical Treatment of Animals by *David N. Ventker.*

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Eliot Spitzer,* Attorney General of New York, *Preeta D. Bansal,* Solicitor General, *Carol Fischer,* Assistant Solicitor General, and *Jennifer K. Brown,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Janet Napolitano* of Arizona, *Bill Lockyer* of California, *Richard Blumenthal* of Connecticut, *Earl I. Anzai* of Hawaii, *Carla J. Stovall* of Kansas, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Patricia A. Madrid* of New Mexico, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Sheldon Whitehouse* of Rhode Island, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for the City of Boulder et al. by *Daniel E. Muse* and *James C. Thomas;* for the American College of Obstetricians and Gynecologists et al. by *Carter G. Phillips, Mark E. Haddad, Ann E. Allen, Michael L. Ile,* and *Leonard A. Nelson;* and for the National Abortion and Reproductive Rights Action League et al. by *Lucinda M. Finley, Jennifer C. Jaff, Martha F. Davis, Roslyn Powell,* and *Yolanda S. Wu.*

Briefs of *amici curiae* were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt* and *Laurence Gold;* and for the Life Legal Defense Foundation by *Andrew W. Zepeda.*

JUSTICE STEVENS delivered the opinion of the Court.

At issue is the constitutionality of a 1993 Colorado statute that regulates speech-related conduct within 100 feet of the entrance to any health care facility. The specific section of the statute that is challenged, Colo. Rev. Stat. § 18–9–122(3) (1999), makes it unlawful within the regulated areas for any person to "knowingly approach" within eight feet of another person, without that person's consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . ."[1] Although the statute prohibits speakers from

---

[1] The entire § 18–9–122 reads as follows:

"(1) The general assembly recognizes that access to health care facilities for the purpose of obtaining medical counseling and treatment is imperative for the citizens of this state; that the exercise of a person's right to protest or counsel against certain medical procedures must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner; and that preventing the willful obstruction of a person's access to medical counseling and treatment at a health care facility is a matter of statewide concern. The general assembly therefore declares that it is appropriate to enact legislation that prohibits a person from knowingly obstructing another person's entry to or exit from a health care facility.

"(2) A person commits a class 3 misdemeanor if such person knowingly obstructs, detains, hinders, impedes, or blocks another person's entry to or exit from a health care facility.

"(3) No person shall knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility. Any person who violates this subsection (3) commits a class 3 misdemeanor.

"(4) For the purposes of this section, 'health care facility' means any entity that is licensed, certified, or otherwise authorized or permitted by law to administer medical treatment in this state.

"(5) Nothing in this section shall be construed to prohibit a statutory or home rule city or county or city and county from adopting a law for the

approaching unwilling listeners, it does not require a standing speaker to move away from anyone passing by. Nor does it place any restriction on the content of any message that anyone may wish to communicate to anyone else, either inside or outside the regulated areas. It does, however, make it more difficult to give unwanted advice, particularly in the form of a handbill or leaflet, to persons entering or leaving medical facilities.

The question is whether the First Amendment rights of the speaker are abridged by the protection the statute provides for the unwilling listener.

## I

Five months after the statute was enacted, petitioners filed a complaint in the District Court for Jefferson County, Colorado, praying for a declaration that § 18-9-122(3) was facially invalid and seeking an injunction against its enforcement. They stated that prior to the enactment of the statute, they had engaged in "sidewalk counseling" on the public ways and sidewalks within 100 feet of the entrances to facilities where human abortion is practiced or where medical personnel refer women to other facilities for abortions. "Sidewalk counseling" consists of efforts "to educate, counsel, persuade, or inform passersby about abortion and abortion alternatives by means of verbal or written speech, including conversation and/or display of signs and/or distribution of literature."[2] They further alleged that such activities frequently entail being within eight feet of other persons and that their fear of prosecution under the new statute

---

control of access to health care facilities that is no less restrictive than the provisions of this section.

"(6) In addition to, and not in lieu of, the penalties set forth in this section, a person who violates the provisions of this section shall be subject to civil liability, as provided in section 13-21-106.7, C. R. S."

[2] App. 17.

caused them "to be chilled in the exercise of fundamental constitutional rights."[3]

Count 5 of the complaint claimed violations of the right to free speech protected by the First Amendment to the Federal Constitution, and Count 6 alleged that the impairment of the right to distribute written materials was a violation of the right to a free press.[4] The complaint also argued that the statutory consent requirement was invalid as a prior restraint tantamount to a licensing requirement, that the statute was vague and overbroad, and that it was a content-based restriction that was not justified by a compelling state interest. Finally, petitioners contended that § 18-9-122(3) was content based for two reasons: The content of the speech must be examined to determine whether it "constitutes oral protest, counseling and education"; and that it is "viewpoint-based" because the statute "makes it likely that prosecution will occur based on displeasure with the position taken by the speaker."[5]

In their answers to the complaint, respondents admitted virtually all of the factual allegations. They filed a motion for summary judgment supported by affidavits, which included a transcript of the hearings that preceded the enactment of the statute. It is apparent from the testimony of both supporters and opponents of the statute that demonstrations in front of abortion clinics impeded access to those clinics and were often confrontational.[6] Indeed, it was a common practice to provide escorts for persons entering and leaving the clinics both to ensure their access and to provide

---

[3] *Id.*, at 18–19.

[4] Counts 1 through 4 alleged violations of the Colorado Constitution, Count 7 alleged a violation of the right to peaceable assembly, and Counts 8 and 9 alleged violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

[5] *Id.*, at 25–26.

[6] The legislature also heard testimony that other types of protests at medical facilities, such as those involving animal rights, create difficulties for persons attempting to enter the facility. App. to Pet. for Cert. 40a.

protection from aggressive counselors who sometimes used strong and abusive language in face-to-face encounters.[7] There was also evidence that emotional confrontations may adversely affect a patient's medical care.[8]  There was no evidence, however, that the "sidewalk counseling" conducted by petitioners in this case was ever abusive or confrontational.

The District Judge granted respondents' motion and dismissed the complaint.  Because the statute had not actually been enforced against petitioners, he found that they only raised a facial challenge.[9]  He agreed with petitioners that their sidewalk counseling was conducted in a "quintessential" public forum, but held that the statute permissibly imposed content-neutral "time, place, and manner restrictions" that were narrowly tailored to serve a significant government interest, and left open ample alternative channels of communication.[10]  Relying on *Ward* v. *Rock Against Rac-*

---

[7] A nurse practitioner testified that some antiabortion protesters "'yell, thrust signs in faces, and generally try to upset the patient as much as possible, which makes it much more difficult for us to provide care in a scary situation anyway.'" *Hill* v. *Thomas*, 973 P. 2d 1246, 1250 (Colo. 1999).  A volunteer who escorts patients into and out of clinics testified that the protesters "'are flashing their bloody fetus signs.  They are yelling, "you are killing your baby."  [T]hey are talking about fetuses and babies being dismembered, arms and legs torn off . . . a mother and her daughter . . . were immediately surrounded and yelled at and screamed at . . . .'"  *Id.*, at 1250–1251.

[8] A witness representing the Colorado Coalition of Persons with Disabilities, who had had 35 separate surgeries in the preceding eight years, testified: "Each and every one is tough.  And the night before and the morning of any medical procedure that's invasive is the toughest part of all.  You don't need additional stressors *[sic]* placed on you while you're trying to do it. . . . We all know about our own personal faith.  You don't need somebody standing in your face screaming at you when you are going in for what may be one of the most traumatic experiences of your life anyway.  Why make it more traumatic?"  App. 108.

[9] App. to Pet. for Cert. 31a.

[10] *Id.*, at 32a.

*ism*, 491 U. S. 781, 791 (1989), he noted that "'[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" He found that the text of the statute "applies to all viewpoints, rather [than] only certain viewpoints," and that the legislative history made it clear that the State had not favored one viewpoint over another.[11] He concluded that the "free zone" created by the statute was narrowly tailored under the test announced in *Ward*, and that it left open ample alternative means of communication because signs and leaflets may be seen, and speech may be heard, at a distance of eight feet. Noting that petitioners had stated in their affidavits that they intended to "continue with their protected First Amendment activities," he rejected their overbreadth challenge because he believed "the statute will do little to deter protected speech."[12] Finally, he concluded that the statute was not vague and that the prior restraint doctrine was inapplicable because the "statute requires no license or permit scheme prior to speaking."[13]

The Colorado Court of Appeals affirmed for reasons similar to those given by the District Judge. It noted that even though only seven percent of the patients receiving services at one of the clinics were there to obtain abortion services, all 60,000 of that clinic's patients "were subjected to the same treatment by the protesters."[14] It also reviewed our then-recent decision in *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753 (1994), and concluded that *Madsen's* reasoning supported the conclusion that the statute was content neutral.[15]

---

[11] *Id.*, at 32a–33a.
[12] *Id.*, at 35a.
[13] *Id.*, at 36a.
[14] *Hill* v. *Lakewood*, 911 P. 2d 670, 672 (1995).
[15] *Id.*, at 673–674.

In 1996, the Supreme Court of Colorado denied review,[16] and petitioners sought a writ of certiorari from our Court. While their petition was pending, we decided *Schenck* v. *Pro-Choice Network of Western N. Y.*, 519 U. S. 357 (1997). Because we held in that case that an injunctive provision creating a speech-free "floating buffer zone" with a 15-foot radius violates the First Amendment, we granted certiorari, vacated the judgment of the Colorado Court of Appeals, and remanded the case to that court for further consideration in light of *Schenck*.   519 U. S. 1145 (1997).

On remand the Court of Appeals reinstated its judgment upholding the statute.   It noted that in *Schenck* we had "expressly declined to hold that a valid governmental interest in ensuring ingress and egress to a medical clinic may never be sufficient to justify a zone of separation between individuals entering and leaving the premises and protesters" and that our opinion in *Ward* provided the standard for assessing the validity of a content-neutral, generally applicable statute.   Under that standard, even though a 15-foot floating buffer might preclude protesters from expressing their views from a normal conversational distance, a lesser distance of eight feet was sufficient to protect such speech on a public sidewalk.[17]

The Colorado Supreme Court granted certiorari and affirmed the judgment of the Court of Appeals.   In a thorough opinion, the court began by commenting on certain matters that were not in dispute.   It reviewed the history of the statute in detail and concluded that it was intended to protect both the "citizen's 'right to protest' or counsel against certain medical procedures" and also to ensure "that government protects a 'person's right to obtain medical counseling and treatment.'"[18]   It noted that both the trial court and the Court of Appeals had concluded that the statute was con-

---

[16] App. to Pet. for Cert. 46a.

[17] *Hill* v. *Lakewood*, 949 P. 2d 107, 109 (1997).

[18] 973 P. 2d, at 1249 (quoting § 18–9–122(1)).

tent neutral, that petitioners no longer contended otherwise, and that they agreed that the question for decision was whether the statute was a valid time, place, and manner restriction under the test announced in *Ward*.[19]

The court identified two important distinctions between this case and *Schenck*. First, *Schenck* involved a judicial decree and therefore, as explained in *Madsen*, posed "greater risks of censorship and discriminatory application than do general ordinances."[20] Second, unlike the floating buffer zone in *Schenck*, which would require a protester either to stop talking or to get off the sidewalk whenever a patient came within 15 feet, the "knowingly approaches" requirement in the Colorado statute allows a protester to stand still while a person moving toward or away from a health care facility walks past her.[21] Applying the test in *Ward*, the court concluded that the statute was narrowly drawn to further a significant government interest. It rejected petitioners' contention that it was not narrow enough because it applied to all health care facilities in the State. In the court's view, the comprehensive coverage of the statute was a factor that supported its content neutrality. Moreover, the fact that the statute was enacted, in part, because the General

---

[19] "[P]etitioners concede that the test for a time, place, and manner restriction is the appropriate measure of this statute's constitutionality. *See* Tape Recording of Oral Argument, Oct. 19, 1998, statement of James M. Henderson, Esq. Petitioners argue that pursuant to the test announced in *Ward*, the 'floating buffer zone' created by section 18–9–122(3) is not narrowly tailored to serve a significant government interest and that section 18–9–122(3) does not provide for ample alternative channels of communication. We disagree." *Id.*, at 1251.

"We note that both the trial court and the court of appeals found that section 18–9–122(3) is content-neutral, and that petitioners do not contend otherwise in this appeal." *Id.*, at 1256.

[20] *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 764 (1994).

[21] 973 P. 2d, at 1257–1258 ("What renders this statute less restrictive than . . . the injunction in *Schenck* . . . is that under section 18–9–122(3), there is no duty to withdraw placed upon petitioners even within the eight-foot limited floating buffer zone").

Assembly "was concerned with the safety of individuals seeking wide-ranging health care services, not merely abortion counseling and procedures," added to the substantiality of the government interest that it served.[22]   Finally, it concluded that ample alternative channels remain open because petitioners, and

> "indeed, everyone, are still able to protest, counsel, shout, implore, dissuade, persuade, educate, inform, and distribute literature regarding abortion.   They just cannot knowingly approach within eight feet of an individual who is within 100 feet of a health care facility entrance without that individual's consent.   As articulated so well . . . in *Ward*, ['the fact that § 18–9–122(3)] may reduce to some degree the potential audience for [petitioners'] speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate.'"[23]

Because of the importance of the case, we granted certiorari.   527 U. S. 1068 (1999).   We now affirm.

## II

Before confronting the question whether the Colorado statute reflects an acceptable balance between the constitutionally protected rights of law-abiding speakers and the interests of unwilling listeners, it is appropriate to examine the competing interests at stake.   A brief review of both sides of the dispute reveals that each has legitimate and important concerns.

The First Amendment interests of petitioners are clear and undisputed.   As a preface to their legal challenge, petitioners emphasize three propositions.   First, they accu-

---

[22] *Id.*, at 1258.

[23] *Ibid.* (quoting *Ward* v. *Rock Against Racism*, 491 U. S. 781, 802 (1989)).

rately explain that the areas protected by the statute encompass all the public ways within 100 feet of every entrance to every health care facility everywhere in the State of Colorado. There is no disagreement on this point, even though the legislative history makes it clear that its enactment was primarily motivated by activities in the vicinity of abortion clinics. Second, they correctly state that their leafletting, sign displays, and oral communications are protected by the First Amendment. The fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection. Third, the public sidewalks, streets, and ways affected by the statute are "quintessential" public forums for free speech. Finally, although there is debate about the magnitude of the statutory impediment to their ability to communicate effectively with persons in the regulated zones, that ability, particularly the ability to distribute leaflets, is unquestionably lessened by this statute.

On the other hand, petitioners do not challenge the legitimacy of the state interests that the statute is intended to serve. It is a traditional exercise of the States' "police powers to protect the health and safety of their citizens." *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 475 (1996). That interest may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests. See *Madsen* v. *Women's Health Center, Inc.,* 512 U. S. 753 (1994); *NLRB* v. *Baptist Hospital, Inc.,* 442 U. S. 773 (1979). Moreover, as with every exercise of a State's police powers, rules that provide specific guidance to enforcement authorities serve the interest in evenhanded application of the law. Whether or not those interests justify the particular regulation at issue, they are unquestionably legitimate.

It is also important when conducting this interest analysis to recognize the significant difference between state restric-

tions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication. This statute deals only with the latter.

The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience. But the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it. *Frisby* v. *Schultz,* 487 U. S. 474, 487 (1988). Indeed, "[i]t may not be the content of the speech, as much as the deliberate 'verbal or visual assault,' that justifies proscription." *Erznoznik* v. *Jacksonville,* 422 U. S. 205, 210–211, n. 6 (1975) (citation and brackets omitted). Even in a public forum, one of the reasons we tolerate a protester's right to wear a jacket expressing his opposition to government policy in vulgar language is because offended viewers can "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen* v. *California,* 403 U. S. 15, 21 (1971).

The recognizable privacy interest in avoiding unwanted communication varies widely in different settings. It is far less important when "strolling through Central Park" than when "in the confines of one's own home," or when persons are "powerless to avoid" it. *Id.,* at 21–22. But even the interest in preserving tranquility in "the Sheep Meadow" portion of Central Park may at times justify official restraints on offensive musical expression. *Ward,* 491 U. S., at 784, 792. More specific to the facts of this case, we have recognized that "[t]he First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." *Madsen,* 512 U. S., at 772–773.

The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be let alone" that one

of our wisest Justices characterized as "the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).[24] The right to avoid unwelcome speech has special force in the privacy of the home, *Rowan* v. *Post Office Dept.,* 397 U. S. 728, 738 (1970), and its immediate surroundings, *Frisby* v. *Schultz,* 487 U. S., at 485, but can also be protected in confrontational settings. Thus, this comment on the right to free passage in going to and from work applies equally—or perhaps with greater force—to access to a medical facility:

> "How far may men go in persuasion and communication and still not violate the right of those whom they would influence? In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege. We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free, and his employer has a right to have him free." *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 204 (1921).

We have since recognized that the "right to persuade" discussed in that case is protected by the First Amendment, *Thornhill* v. *Alabama,* 310 U. S. 88 (1940), as well as by fed-

---

[24] This common-law "right" is more accurately characterized as an "interest" that States can choose to protect in certain situations. See *Katz* v. *United States,* 389 U. S. 347, 350–351 (1967).

eral statutes. Yet we have continued to maintain that "no one has a right to press even 'good' ideas on an unwilling recipient." *Rowan*, 397 U. S., at 738. None of our decisions has minimized the enduring importance of "a right to be free" from persistent "importunity, following and dogging" after an offer to communicate has been declined. While the freedom to communicate is substantial, "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." *Id.*, at 736. It is that right, as well as the right of "passage without obstruction," that the Colorado statute legitimately seeks to protect. The restrictions imposed by the Colorado statute only apply to communications that interfere with these rights rather than those that involve willing listeners.

The dissenters argue that we depart from precedent by recognizing a "right to avoid unpopular speech in a public forum," *post*, at 771 (opinion of KENNEDY, J.); see also *post*, at 749–754 (opinion of SCALIA, J.). We, of course, are not addressing whether there is such a "right." Rather, we are merely noting that our cases have repeatedly recognized the interests of unwilling listeners in situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure. See *Lehman* v. [*Shaker Heights*, 418 U. S. 298 (1974)]." *Erznoznik*, 422 U. S., at 209. We explained in *Erznoznik* that "[t]his Court has considered analogous issues—pitting the First Amendment rights of speakers against the privacy rights of those who may be unwilling viewers or auditors—in a variety of contexts. Such cases demand delicate balancing." *Id.*, at 208 (citations omitted). The dissenters, however, appear to consider recognizing any of the interests of unwilling listeners—let alone balancing those interests against the rights of speakers—to be unconstitutional. Our cases do not support this view.[25]

---

[25] Furthermore, whether there is a "right" to avoid unwelcome expression is not before us in this case. The purpose of the Colorado statute is not to protect a potential listener from hearing a particular message. It

## III

All four of the state court opinions upholding the validity of this statute concluded that it is a content-neutral time, place, and manner regulation. Moreover, they all found support for their analysis in *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989).[26] It is therefore appropriate to comment on the "content neutrality" of the statute. As we explained in *Ward:*

> "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.,* at 791.

The Colorado statute passes that test for three independent reasons. First, it is not a "regulation of speech." Rather, it is a regulation of the places where some speech may occur. Second, it was not adopted "because of disagreement with the message it conveys." This conclusion is supported not just by the Colorado courts' interpretation of legislative history, but more importantly by the State Supreme Court's unequivocal holding that the statute's "restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech."[27] Third, the State's interests in protecting

---

is to protect those who seek medical treatment from the potential physical and emotional harm suffered when an unwelcome individual delivers a message (whatever its content) by physically approaching an individual at close range, *i. e.,* within eight feet. In offering protection from that harm, while maintaining free access to health clinics, the State pursues interests constitutionally distinct from the freedom from unpopular speech to which JUSTICE KENNEDY refers.

[26] See App. to Pet. for Cert. 32a (Colo. Dist. Ct.); 911 P. 2d, at 673–674 (Colo. Ct. App.); 949 P. 2d, at 109 (Colo. Ct. App.); 973 P. 2d, at 1256 (Colo. Sup. Ct.).

[27] *Ibid.* This observation in *Madsen* is equally applicable here: "There is no suggestion in this record that Florida law would not equally restrain similar conduct directed at a target having nothing to do with abortion;

access and privacy, and providing the police with clear guidelines, are unrelated to the content of the demonstrators' speech. As we have repeatedly explained, government regulation of expressive activity is "content neutral" if it is justified without reference to the content of regulated speech. See *ibid.* and cases cited.

Petitioners nevertheless argue that the statute is not content neutral insofar as it applies to some oral communication. The statute applies to all persons who "knowingly approach" within eight feet of another for the purpose of leafletting or displaying signs; for such persons, the content of their oral statements is irrelevant. With respect to persons who are neither leafletters nor sign carriers, however, the statute does not apply unless their approach is "for the purpose of . . . engaging in oral protest, education, or counseling." Petitioners contend that an individual near a health care facility who knowingly approaches a pedestrian to say "good morning" or to randomly recite lines from a novel would not be subject to the statute's restrictions.[28] Because the content of the oral statements made by an approaching speaker must sometimes be examined to determine whether the knowing approach is covered by the statute, petitioners argue that the law is "content-based" under our reasoning in *Carey* v. *Brown*, 447 U. S. 455, 462 (1980).

Although this theory was identified in the complaint, it is not mentioned in any of the four Colorado opinions, all of which concluded that the statute was content neutral. For that reason, it is likely that the argument has been waived. Additionally, the Colorado attorney general argues that we should assume that the state courts tacitly construed the terms "protest, education, or counseling" to encompass "all

---

none of the restrictions imposed by the court were directed at the contents of petitioner's message." 512 U. S., at 762–763.

[28] See Brief for Petitioners 32, n. 23.

communication."[29]   Instead of relying on those arguments, however, we shall explain why petitioners' contention is without merit and why their reliance on *Carey* v. *Brown* is misplaced.

It is common in the law to examine the content of a communication to determine the speaker's purpose.  Whether a particular statement constitutes a threat, blackmail, an agreement to fix prices, a copyright violation, a public offering of securities, or an offer to sell goods often depends on the precise content of the statement.  We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.  With respect to the conduct that is the focus of the Colorado statute, it is unlikely that there would often be any need to know exactly what words were spoken in order to determine whether "sidewalk counselors" are engaging in "oral protest, education, or counseling" rather than pure social or random conversation.

Theoretically, of course, cases may arise in which it is necessary to review the content of the statements made by a person approaching within eight feet of an unwilling listener to determine whether the approach is covered by the statute.  But that review need be no more extensive than a determination whether a general prohibition of "picketing" or "demonstrating" applies to innocuous speech.  The regulation of such expressive activities, by definition, does not cover social, random, or other everyday communications.  See Webster's Third New International Dictionary 600, 1710 (1993) (defining "demonstrate" as "to make a public display of sentiment for or against a person or cause" and "picket" as an

---

[29] "The Colorado Supreme Court's ruling confirms that the statutory language should be interpreted to refer to approaches for all communication, as Colorado has argued since the beginning of this case."  Brief for Respondents 21.

effort "to persuade or otherwise influence"). Nevertheless, we have never suggested that the kind of cursory examination that might be required to exclude casual conversation from the coverage of a regulation of picketing would be problematic.[30]

· In *Carey* v. *Brown* we examined a general prohibition of peaceful picketing that contained an exemption for picketing a place of employment involved in a labor dispute. We concluded that this statute violated the Equal Protection Clause of the Fourteenth Amendment, because it discriminated between lawful and unlawful conduct based on the content of the picketers' messages. That discrimination was impermissible because it accorded preferential treatment to expression concerning one particular subject matter—labor disputes—while prohibiting discussion of all other issues. Although our opinion stressed that "it is the content of the speech that determines whether it is within or without the statute's blunt prohibition," 447 U. S., at 462, we appended a footnote to that sentence explaining that it was the fact that the statute placed a prohibition on discussion of particular topics, while others were allowed, that was constitutionally

---

[30] In *United States* v. *Grace*, 461 U. S. 171 (1983), after examining a federal statute that was "[i]nterpreted and applied" as "prohibit[ing] picketing and leafletting, but not other expressive conduct" within the Supreme Court building and grounds, we concluded that "it is clear that the prohibition is facially content-neutral." *Id.*, at 181, n. 10. Similarly, we have recognized that statutes can equally restrict all "picketing." See, *e. g., Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 98 (1972) ("This is not to say that all picketing must always be allowed. We have continually recognized that reasonable 'time, place and manner' regulations of picketing may be necessary to further significant governmental interests"), and cases cited. See also *Frisby* v. *Schultz*, 487 U. S. 474 (1988) (upholding a general ban on residential picketing). And our decisions in *Schenck* and *Madsen* both upheld injunctions that also prohibited "demonstrating." *Schenck* v. *Pro-Choice Network of Western N. Y.*, 519 U. S. 357, 366–367, n. 3 (1997); *Madsen*, 512 U. S., at 759.

repugnant.[31]    Regulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulation. *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 538 (1980).

The Colorado statute's regulation of the location of protests, education, and counseling is easily distinguishable from *Carey*.    It places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by a speaker.    Rather, it simply establishes a minor place restriction on an extremely broad category of communications with unwilling listeners.    Instead of drawing distinctions based on the subject that the approaching speaker may wish to address, the statute applies equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries.    Each can attempt to educate unwilling listeners on any subject, but without consent may not approach within eight feet to do so.

The dissenters, nonetheless, contend that the statute is not "content neutral."    As JUSTICE SCALIA points out, the vice of content-based legislation in this context is that "it lends itself" to being "'used for invidious thought-control purposes.'"    *Post*, at 743.    But a statute that restricts certain categories of speech only lends itself to invidious use if there is a significant number of communications, raising the same problem that the statute was enacted to solve, that fall outside the statute's scope, while others fall inside.    *E. g., Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972).    Here,

---

[31] "It is, of course, no answer to assert that the Illinois statute does not discriminate on the basis of the speaker's viewpoint, but only on the basis of the subject matter of his message.    'The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" *Carey* v. *Brown*, 447 U. S. 455, 462, n. 6 (1980) (quoting *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537 (1980)).

the statute's restriction seeks to protect those who enter a health care facility from the harassment, the nuisance, the persistent importuning, the following, the dogging, and the implied threat of physical touching that can accompany an unwelcome approach within eight feet of a patient by a person wishing to argue vociferously face-to-face and perhaps thrust an undesired handbill upon her. The statutory phrases, "oral protest, education, or counseling," distinguish speech activities likely to have those consequences from speech activities (such as JUSTICE SCALIA's "happy speech," *post*, at 743) that are most unlikely to have those consequences. The statute does not distinguish among speech instances that are similarly likely to raise the legitimate concerns to which it responds. Hence, the statute cannot be struck down for failure to maintain "content neutrality," or for "underbreadth."

Also flawed is JUSTICE KENNEDY's theory that a statute restricting speech becomes unconstitutionally content based because of its application "to the specific locations where [that] discourse occurs," *post*, at 767. A statute prohibiting solicitation in airports that was motivated by the aggressive approaches of Hare Krishnas does not become content based solely because its application is confined to airports—"the specific locations where [that] discourse occurs." A statute making it a misdemeanor to sit at a lunch counter for an hour without ordering any food would also not be "content based" even if it were enacted by a racist legislature that hated civil rights protesters (although it might raise separate questions about the State's legitimate interest at issue). See *ibid.*

Similarly, the contention that a statute is "viewpoint based" simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support. *Post*, at 768–769 (KENNEDY, J., dissenting). The antipicketing ordinance upheld in *Frisby* v. *Schultz*, 487 U. S. 474 (1988), a decision in which both of today's dissenters

joined, was obviously enacted in response to the activities of antiabortion protesters who wanted to protest at the home of a particular doctor to persuade him and others that they viewed his practice of performing abortions to be murder. We nonetheless summarily concluded that the statute was content neutral.  *Id.*, at 482.

JUSTICE KENNEDY further suggests that a speaker who approaches a patient and "chants in praise of the Supreme Court and its abortion decisions," or hands out a simple leaflet saying, " 'We are for abortion rights,' " would not be subject to the statute.  *Post*, at 769.  But what reason is there to believe the statute would not apply to that individual?  She would be engaged in "oral protest" and "education," just as the abortion opponent who expresses her view that the Supreme Court decisions were incorrect would be "protest[ing]" the decisions and "educat[ing]" the patient on the issue.  The close approach of the latter, more hostile, demonstrator may be more likely to risk being perceived as a form of physical harassment; but the relevant First Amendment point is that the statute would prevent both speakers, unless welcome, from entering the 8-foot zone. The statute is not limited to those who oppose abortion. It applies to the demonstrator in JUSTICE KENNEDY's example.  It applies to all "protest," to all "counseling," and to all demonstrators whether or not the demonstration concerns abortion, and whether they oppose or support the woman who has made an abortion decision.  That is the level of neutrality that the Constitution demands.

The Colorado courts correctly concluded that § 18–9–122(3) is content neutral.

IV

We also agree with the state courts' conclusion that § 18–9–122(3) is a valid time, place, and manner regulation under the test applied in *Ward* because it is "narrowly tailored." We already have noted that the statute serves governmental interests that are significant and legitimate and that the re-

strictions are content neutral. We are likewise persuaded that the statute is "narrowly tailored" to serve those interests and that it leaves open ample alternative channels for communication. As we have emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.[32]

The three types of communication regulated by § 18–9–122(3) are the display of signs, leafletting, and oral speech. The 8-foot separation between the speaker and the audience should not have any adverse impact on the readers' ability to read signs displayed by demonstrators. In fact, the separation might actually aid the pedestrians' ability to see the signs by preventing others from surrounding them and impeding their view. Furthermore, the statute places no limitations on the number, size, text, or images of the placards. And, as with all of the restrictions, the 8-foot zone does not affect demonstrators with signs who remain in place.

With respect to oral statements, the distance certainly can make it more difficult for a speaker to be heard, particularly if the level of background noise is high and other speakers are competing for the pedestrian's attention. Notably, the statute places no limitation on the number of speakers or the noise level, including the use of amplification equipment, although we have upheld such restrictions in past cases. See, e. g., Madsen, 512 U. S., at 772–773. More significantly, this statute does not suffer from the failings that compelled us to reject the "floating buffer zone" in Schenck, 519 U. S., at 377. Unlike the 15-foot zone in Schenck, this 8-foot zone allows the speaker to communicate at a "normal conversa-

---

[32] "Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." Ward v. Rock Against Racism, 491 U. S., at 798.

tional distance." *Ibid.* Additionally, the statute allows the speaker to remain in one place, and other individuals can pass within eight feet of the protester without causing the protester to violate the statute. Finally, here there is a "knowing" requirement that protects speakers "who thought they were keeping pace with the targeted individual" at the proscribed distance from inadvertently violating the statute. *Id.*, at 378, n. 9.

It is also not clear that the statute's restrictions will necessarily impede, rather than assist, the speakers' efforts to communicate their messages. The statute might encourage the most aggressive and vociferous protesters to moderate their confrontational and harassing conduct, and thereby make it easier for thoughtful and law-abiding sidewalk counselors like petitioners to make themselves heard. But whether or not the 8-foot interval is the best possible accommodation of the competing interests at stake, we must accord a measure of deference to the judgment of the Colorado Legislature. See *Madsen*, 512 U. S., at 769–770. Once again, it is worth reiterating that only attempts to address unwilling listeners are affected.

The burden on the ability to distribute handbills is more serious because it seems possible that an 8-foot interval could hinder the ability of a leafletter to deliver handbills to some unwilling recipients. The statute does not, however, prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept.[33] And, as in all leafletting situations, pedestrians continue to be free to decline the tender. In *Heffron* v. *International Soc. for*

---

[33] JUSTICE KENNEDY states that the statute "forecloses peaceful leafletting," *post*, at 780. This is not correct. All of the cases he cites in support of his argument involve a total ban on a medium of expression to both willing and unwilling recipients, see *post*, at 780–787. Nothing in this statute, however, prevents persons from proffering their literature; they simply cannot approach within eight feet of an unwilling recipient.

*Krishna Consciousness, Inc.*, 452 U. S. 640 (1981), we upheld a state fair regulation that required a religious organization desiring to distribute literature to conduct that activity only at an assigned location—in that case booths. As in this case, the regulation primarily burdened the distributors' ability to communicate with unwilling readers. We concluded our opinion by emphasizing that the First Amendment protects the right of every citizen to " 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.' *Kovacs* v. *Cooper*, 336 U. S. 77, 87 (1949)." *Id.*, at 655. The Colorado statute adequately protects those rights.

Finally, in determining whether a statute is narrowly tailored, we have noted that "[w]e must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary." *Madsen*, 512 U. S., at 772. States and municipalities plainly have a substantial interest in controlling the activity around certain public and private places. For example, we have recognized the special governmental interests surrounding schools,[34] courthouses,[35] polling places,[36] and private homes.[37] Additionally, we previously have noted the unique concerns that surround health care facilities:

> " 'Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and [her] family . . . need a restful, uncluttered, relaxing, and

---

[34] See *Grayned* v. *City of Rockford*, 408 U. S. 104, 119 (1972).

[35] See *Cox* v. *Louisiana*, 379 U. S. 559, 562 (1965).

[36] See *Burson* v. *Freeman*, 504 U. S. 191, 206–208 (1992) (plurality opinion); *id.*, at 214–216 (SCALIA, J., concurring in judgment).

[37] See *Frisby* v. *Schultz*, 487 U. S., at 484–485.

helpful atmosphere.'" *Ibid.* (quoting *NLRB* v. *Baptist Hospital, Inc.*, 442 U. S., at 783–784, n. 12).

Persons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach.

JUSTICE KENNEDY, however, argues that the statute leaves petitioners without adequate means of communication. *Post*, at 780. This is a considerable overstatement. The statute seeks to protect those who wish to enter health care facilities, many of whom may be under special physical or emotional stress, from close physical approaches by demonstrators. In doing so, the statute takes a prophylactic approach; it forbids all unwelcome demonstrators to come closer than eight feet. We recognize that by doing so, it will sometimes inhibit a demonstrator whose approach in fact would have proved harmless. But the statute's prophylactic aspect is justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary. Such individualized characterization of each individual movement is often difficult to make accurately. A bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself.

As we explained above, the 8-foot restriction on an unwanted physical approach leaves ample room to communicate a message through speech. Signs, pictures, and voice itself can cross an 8-foot gap with ease. If the clinics in Colorado resemble those in *Schenck*, demonstrators with leaflets

might easily stand on the sidewalk at entrances (without blocking the entrance) and, without physically approaching those who are entering the clinic, peacefully hand them leaflets as they pass by.

Finally, the 8-foot restriction occurs only within 100 feet of a health care facility—the place where the restriction is most needed. The restriction interferes far less with a speaker's ability to communicate than did the total ban on picketing on the sidewalk outside a residence (upheld in *Frisby* v. *Schultz*, 487 U. S. 474 (1988)), the restriction of leafletting at a fairground to a booth (upheld in *Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981)), or the "silence" often required outside a hospital. Special problems that may arise where clinics have particularly wide entrances or are situated within multipurpose office buildings may be worked out as the statute is applied.

This restriction is thus reasonable and narrowly tailored.

## V

Petitioners argue that § 18–9–122(3) is invalid because it is "overbroad." There are two parts to petitioners' "overbreadth" argument. On the one hand, they argue that the statute is too broad because it protects too many people in too many places, rather than just the patients at the facilities where confrontational speech had occurred. Similarly, it burdens all speakers, rather than just persons with a history of bad conduct.[38] On the other hand, petitioners also contend that the statute is overbroad because it "bans virtually the universe of protected expression, including displays of signs, distribution of literature, and mere verbal statements."[39]

The first part of the argument does not identify a constitutional defect. The fact that the coverage of a statute is

---

[38] Brief for Petitioners 22–23.

[39] *Id.*, at 25.

broader than the specific concern that led to its enactment is of no constitutional significance. What is important is that all persons entering or leaving health care facilities share the interests served by the statute. It is precisely because the Colorado Legislature made a general policy choice that the statute is assessed under the constitutional standard set forth in *Ward*, 491 U. S., at 791, rather than a more strict standard. See *Madsen*, 512 U. S., at 764. The cases cited by petitioners are distinguishable from this statute. In those cases, the government attempted to regulate nonprotected activity, yet because the statute was overbroad, protected speech was also implicated. See *Houston* v. *Hill*, 482 U. S. 451 (1987); *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947 (1984). In this case, it is not disputed that the regulation affects protected speech activity; the question is thus whether it is a "reasonable restrictio[n] on the time, place, or manner of protected speech." *Ward*, 491 U. S., at 791. Here, the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive. As Justice Jackson observed, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Railway Express Agency, Inc.* v. *New York*, 336 U. S. 106, 112 (1949) (concurring opinion).

The second part of the argument is based on a misreading of the statute and an incorrect understanding of the overbreadth doctrine. As we have already noted, § 18–9–122(3) simply does not "ban" any messages, and likewise it does not "ban" any signs, literature, or oral statements. It merely regulates the places where communications may occur. As we explained in *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973), the overbreadth doctrine enables litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or

assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Moreover, "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.*, at 615. Petitioners have not persuaded us that the impact of the statute on the conduct of other speakers will differ from its impact on their own sidewalk counseling. Cf. *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 801 (1984). Like petitioners' own activities, the conduct of other protesters and counselors at all health care facilities are encompassed within the statute's "legitimate sweep." Therefore, the statute is not overly broad.

## VI

Petitioners also claim that § 18–9–122(3) is unconstitutionally vague. They find a lack of clarity in three parts of the section: the meaning of "protest, education, or counseling"; the "consent" requirement; and the determination whether one is "approaching" within eight feet of another.

A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement. *Chicago* v. *Morales*, 527 U. S. 41, 56–57 (1999).

In this case, the first concern is ameliorated by the fact that § 18–9–122(3) contains a scienter requirement. The statute only applies to a person who "knowingly" approaches within eight feet of another, without that person's consent, for the purpose of engaging in oral protest, education, or counseling. The likelihood that anyone would not understand any of those common words seems quite remote.

Petitioners proffer hypertechnical theories as to what the statute covers, such as whether an outstretched arm constitutes "approaching."[40] And while "[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question," *American Communications Assn.* v. *Douds*, 339 U. S. 382, 412 (1950), because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language," *Grayned* v. *City of Rockford*, 408 U. S. 104, 110 (1972). For these reasons, we rejected similar vagueness challenges to the injunctions at issue in *Schenck*, 519 U. S., at 383, and *Madsen*, 512 U. S., at 775–776. We thus conclude that "it is clear what the ordinance as a whole prohibits." *Grayned*, 408 U. S., at 110. More importantly, speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid "in the vast majority of its intended applications," *United States* v. *Raines*, 362 U. S. 17, 23 (1960).

For the same reason, we are similarly unpersuaded by the suggestion that § 18–9–122(3) fails to give adequate guidance to law enforcement authorities. Indeed, it seems to us that one of the section's virtues is the specificity of the definitions of the zones described in the statute. "As always, enforcement requires the exercise of some degree of police judgment," *Grayned*, 408 U. S., at 114, and the degree of judgment involved here is acceptable.

## VII

Finally, petitioners argue that § 18–9–122(3)'s consent requirement is invalid because it imposes an unconstitutional "prior restraint" on speech. We rejected this argument previously in *Schenck*, 519 U. S., at 374, n. 6, and *Madsen*, 512 U. S., at 764, n. 2. Moreover, the restrictions in this case raise an even lesser prior restraint concern than those at

---

[40] Brief for Petitioners 48.

issue in *Schenck* and *Madsen* where particular speakers were at times completely banned within certain zones. Under this statute, absolutely no channel of communication is foreclosed. No speaker is silenced. And no message is prohibited. Petitioners are simply wrong when they assert that "[t]he statute compels speakers to obtain consent to speak and it authorizes private citizens to deny petitioners' requests to engage in expressive activities."[41] To the contrary, this statute does not provide for a "heckler's veto" but rather allows every speaker to engage freely in any expressive activity communicating all messages and viewpoints subject only to the narrow place requirement imbedded within the "approach" restriction.

Furthermore, our concerns about "prior restraints" relate to restrictions imposed by official censorship.[42] The regulations in this case, however, only apply if the pedestrian does not consent to the approach.[43] Private citizens have always retained the power to decide for themselves what they wish to read, and within limits, what oral messages they want to consider. This statute simply empowers private citizens entering a health care facility with the ability to prevent a speaker, who is within eight feet and advancing, from communicating a message they do not wish to hear. Further,

---

[41] *Id.*, at 29.

[42] See *Ward*, 491 U. S., at 795, n. 5 ("[T]he regulations we have found invalid as prior restraints have 'had this in common: they gave *public officials* the power to deny use of a forum in advance of actual expression'" (quoting *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 553 (1975) (emphasis added))).

[43] While we have in prior cases found governmental grants of power to private actors constitutionally problematic, those cases are distinguishable. In those cases, the regulations allowed a single, private actor to unilaterally silence a speaker even as to willing listeners. See, *e. g., Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 880 (1997) ("It would confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech . . ."). The Colorado statute at issue here confers no such censorial power on the pedestrian.

the statute does not authorize the pedestrian to affect any other activity at any other location or relating to any other person. These restrictions thus do not constitute an unlawful prior restraint.

\* \* \*

The judgment of the Colorado Supreme Court is affirmed.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE O'CONNOR, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring.

I join the opinion of the Court and add this further word. The key to determining whether Colo. Rev. Stat. § 18–9–122(3) (1999) makes a content-based distinction between varieties of speech lies in understanding that content-based discriminations are subject to strict scrutiny because they place the weight of government behind the disparagement or suppression of some messages, whether or not with the effect of approving or promoting others. *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 812 (2000); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382 (1992); cf. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972). Thus the government is held to a very exacting and rarely satisfied standard when it disfavors the discussion of particular subjects, *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991), or particular viewpoints within a given subject matter, *Carey* v. *Brown*, 447 U. S. 455, 461–463 (1980) (citing *Chicago, supra*, at 95–96); cf. *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 601–602 (1998) (SOUTER, J., dissenting).

Concern about employing the power of the State to suppress discussion of a subject or a point of view is not, however, raised in the same way when a law addresses not the content of speech but the circumstances of its delivery. The right to express unpopular views does not necessarily immunize a speaker from liability for resorting to otherwise im-

permissible behavior meant to shock members of the speaker's audience, see *United States* v. *O'Brien,* 391 U. S. 367, 376 (1968) (burning draft card), or to guarantee their attention, see *Kovacs* v. *Cooper,* 336 U. S. 77, 86–88 (1949) (sound trucks); *Frisby* v. *Schultz,* 487 U. S. 474, 484–485 (1988) (residential picketing); *Heffron* v. *International Soc. for Krishna Consciousness, Inc.,* 452 U. S. 640, 647–648 (1981) (soliciting). Unless regulation limited to the details of a speaker's delivery results in removing a subject or viewpoint from effective discourse (or otherwise fails to advance a significant public interest in a way narrowly fitted to that objective), a reasonable restriction intended to affect only the time, place, or manner of speaking is perfectly valid. See *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989) ("Our cases make clear . . . that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information'" (quoting *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984))); 491 U. S., at 797 ("[O]ur cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech'" (quoting *United States* v. *Albertini,* 472 U. S. 675, 689 (1985))).

It is important to recognize that the validity of punishing some expressive conduct, and the permissibility of a time, place, or manner restriction, does not depend on showing that the particular behavior or mode of delivery has no association with a particular subject or opinion. Draft card burners disapprove of the draft, see *United States* v. *O'Brien, supra,* at 370, and abortion protesters believe abortion is morally wrong, *Madsen* v. *Women's Health Center,*

*Inc.,* 512 U. S. 753, 758 (1994).   There is always a correlation with subject and viewpoint when the law regulates conduct that has become the signature of one side of a controversy. But that does not mean that every regulation of such distinctive behavior is content based as First Amendment doctrine employs that term.   The correct rule, rather, is captured in the formulation that a restriction is content based only if it is imposed because of the content of the speech, see *Ward, supra,* at 791 ("The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys"), and not because of offensive behavior identified with its delivery.

Since this point is as elementary as anything in traditional speech doctrine, it would only be natural to suppose that today's disagreement between the Court and the dissenting Justices must turn on unusual difficulty in evaluating the facts of this case.   But it does not.   The facts overwhelmingly demonstrate the validity of subsection (3) as a content-neutral regulation imposed solely to regulate the manner in which speakers may conduct themselves within 100 feet of the entrance of a health care facility.

No one disputes the substantiality of the government's interest in protecting people already tense or distressed in anticipation of medical attention (whether an abortion or some other procedure) from the unwanted intrusion of close personal importunity by strangers.   The issues dividing the Court, then, go to the content neutrality of the regulation, its fit with the interest to be served by it, and the availability of other means of expressing the desired message (however offensive it may be even without physically close communication).

Each of these issues is addressed principally by the fact that subsection (3) simply does not forbid the statement of any position on any subject.   It does not declare any view

as unfit for expression within the 100-foot zone or beyond it. What it forbids, and all it forbids, is approaching another person closer than eight feet (absent permission) to deliver the message. Anyone (let him be called protester, counselor, or educator) may take a stationary position within the regulated area and address any message to any person within sight or hearing. The stationary protester may be quiet and ingratiating, or loud and offensive; the law does not touch him, even though in some ways it could. See *Madsen, supra,* at 768–771 (injunction may bar protesters from 36-foot zone around entrances to clinic and parking lot).

This is not to say that enforcement of the approach restriction will have no effect on speech; of course it will make some difference. The effect of speech is a product of ideas and circumstances, and time, place, and manner are circumstances. The question is simply whether the ostensible reason for regulating the circumstances is really something about the ideas. Here, the evidence indicates that the ostensible reason is the true reason. The fact that speech by a stationary speaker is untouched by this statute shows that the reason for its restriction on approaches goes to the approaches, not to the content of the speech of those approaching. What is prohibited is a close encounter when the person addressed does not want to get close. So, the intended recipient can stay far enough away to prevent the whispered argument, mitigate some of the physical shock of the shouted denunciation, and avoid the unwanted handbill. But the content of the message will survive on any sign readable at eight feet and in any statement audible from that slight distance. Hence the implausibility of any claim that an anti-abortion message, not the behavior of protesters, is what is being singled out.

The matter of proper tailoring to limit no more speech than necessary to vindicate the public interest deserves a few specific comments, some on matters raised by JUSTICE KENNEDY's dissent. Subsection (3) could possibly be ap-

plied to speakers unlike the present petitioners, who might not know that the entrance to the facility was within 100 feet, or who might try to engage people within 100 feet of a health facility other than a physician's office or hospital, or people having no business with the facility. These objections do not, however, weigh very heavily on a facial challenge like this. The specter of liability on the part of those who importune while oblivious of the facility is laid to rest by the requirement that a defendant act "knowingly." See Colo. Rev. Stat. § 18-1-503(4) (1999) (culpable mental state requirement deemed to apply to each element of offense, absent clear contrary intent). While it is true that subsection (3) was not enacted to protect dental patients, I cannot say it goes beyond the State's interest to do so; someone facing an hour with a drill in his tooth may reasonably be protected from the intrusive behavior of strangers who are otherwise free to speak. While some mere passersby may be protected needlessly, I am skeptical about the number of health care facilities with substantial pedestrian traffic within 100 feet of their doors but unrelated to the business conducted inside. Hence, I fail to see danger of the substantial overbreadth required to be shown before a statute is struck down out of concern for the speech rights of those not before the Court. Cf. *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947, 964-965 (1984); *Houston* v. *Hill*, 482 U. S. 451, 458 (1987).

As for the claim of vagueness, at first blush there is something objectionable. Those who do not choose to remain stationary may not approach within eight feet with a purpose, among others, of "engaging in oral protest, education, or counseling." Colo. Rev. Stat. § 18-9-122(3) (1999). While that formula excludes liability for enquiring about the time or the bus schedule within eight feet, "education" does not convey much else by way of limitation. But that is not fatal here. What is significant is not that the word fails to limit clearly, but that it pretty clearly fails to limit very much at

all. It succeeds in naturally covering any likely address by one person approaching another on a street or parking lot outside a building entrance (aside from common social greetings, protests, or requests for assistance). Someone planning to spread a message by accosting strangers is likely to understand the statute's application to "education." And just because the coverage is so obviously broad, the discretion given to the police in deciding whether to charge an offense seems no greater than the prosecutorial discretion inherent in any generally applicable criminal statute. Cf. *Grayned* v. *City of Rockford,* 408 U. S. 104, 108 (1972) (noting that "[v]ague laws may trap the innocent by not providing fair warning" and that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them"); *Coates* v. *Cincinnati,* 402 U. S. 611, 614 (1971). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward,* 491 U. S., at 794.

Although petitioners have not argued that the "floating bubble" feature of the 8-foot zone around a pedestrian is itself a failure of narrow tailoring, I would note the contrast between the operation of subsection (3) and that of the comparable portion of the injunction struck down in *Schenck* v. *Pro-Choice Network of Western N. Y.,* 519 U. S. 357, 377–379 (1997), where we observed that the difficulty of administering a floating bubble zone threatened to burden more speech than necessary. In *Schenck,* the floating bubble was larger (15 feet) and was associated with near-absolute prohibitions on speech. *Ibid.* Since subsection (3) prohibits only 8-foot approaches, however, with the stationary speaker free to speak, the risk is less. Whether floating bubble zones are so inherently difficult to administer that only fixed, no-speech zones (or prohibitions on ambulatory counseling within a fixed zone) should pass muster is an issue neither before us nor well suited to consideration on a facial challenge, cf. *Ward, supra,* at 794 ("Since respondent does not claim

that city officials enjoy unguided discretion to deny the right to speak altogether, it is open to question whether respondent's claim falls within the narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory authority").

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

The Court today concludes that a regulation requiring speakers on the public thoroughfares bordering medical facilities to speak from a distance of eight feet is "not a 'regulation of speech,'" but "a regulation of the places where some speech may occur," *ante*, at 719; and that a regulation directed to only certain categories of speech (protest, education, and counseling) is not "content-based." For these reasons, it says, the regulation is immune from the exacting scrutiny we apply to content-based suppression of speech in the public forum. The Court then determines that the regulation survives the less rigorous scrutiny afforded content-neutral time, place, and manner restrictions because it is narrowly tailored to serve a government interest—protection of citizens' "right to be let alone"—that has explicitly been disclaimed by the State, probably for the reason that, as a basis for suppressing peaceful private expression, it is patently incompatible with the guarantees of the First Amendment.

None of these remarkable conclusions should come as a surprise. What is before us, after all, is a speech regulation directed against the opponents of abortion, and it therefore enjoys the benefit of the "ad hoc nullification machine" that the Court has set in motion to push aside whatever doctrines of constitutional law stand in the way of that highly favored practice. *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 785 (1994) (SCALIA, J., concurring in judgment in part and dissenting in part). Having deprived abortion opponents of the political right to persuade the electorate that abortion should be restricted by law, the Court today contin-

ues and expands its assault upon their individual right to persuade women contemplating abortion that what they are doing is wrong. Because, like the rest of our abortion jurisprudence, today's decision is in stark contradiction of the constitutional principles we apply in all other contexts, I dissent.

I

Colorado's statute makes it a criminal act knowingly to approach within 8 feet of another person on the public way or sidewalk area within 100 feet of the entrance door of a health care facility for the purpose of passing a leaflet to, displaying a sign to, or engaging in oral protest, education, or counseling with such person. Whatever may be said about the restrictions on the other types of expressive activity, the regulation as it applies to oral communications is obviously and undeniably content based. A speaker wishing to approach another for the purpose of communicating *any* message except one of protest, education, or counseling may do so without first securing the other's consent. Whether a speaker must obtain permission before approaching within eight feet—and whether he will be sent to prison for failing to do so—depends entirely on *what he intends to say* when he gets there. I have no doubt that this regulation would be deemed content based *in an instant* if the case before us involved antiwar protesters, or union members seeking to "educate" the public about the reasons for their strike. "[I]t is," we would say, "the content of the speech that determines whether it is within or without the statute's blunt prohibition," *Carey* v. *Brown,* 447 U. S. 455, 462 (1980). But the jurisprudence of this Court has a way of changing when abortion is involved.

The Court asserts that this statute is not content based for purposes of our First Amendment analysis because it neither (1) discriminates among viewpoints nor (2) places restrictions on "any subject matter that may be discussed by a speaker." *Ante,* at 723. But we have never held that the

universe of content-based regulations is limited to those two categories, and such a holding would be absurd. Imagine, for instance, special place-and-manner restrictions on all speech except that which "conveys a sense of contentment or happiness." This "happy speech" limitation would not be "viewpoint based"—citizens would be able to express their joy in equal measure at either the rise or fall of the NASDAQ, at either the success or the failure of the Republican Party—and would not discriminate on the basis of subject matter, since gratification could be expressed about anything at all. Or consider a law restricting the writing or recitation of poetry—neither viewpoint based nor limited to any particular subject matter. Surely this Court would consider such regulations to be "content based" and deserving of the most exacting scrutiny.[1]

"The vice of content-based legislation—what renders it deserving of the high standard of strict scrutiny—is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes." *Madsen,*

---

[1] The Court responds that statutes which restrict categories of speech—as opposed to subject matter or viewpoint—are constitutionally worrisome only if a "significant number of communications, raising the same problem that the statute was enacted to solve, . . . fall outside the statute's scope, while others fall inside." *Ante,* at 723. I am not sure that is correct, but let us assume, for the sake of argument, that it is. The Court then proceeds to assert that "[t]he statutory phrases, 'oral protest, education, or counseling,' distinguish speech activities likely to" present the problem of "harassment, . . . nuisance, . . . persistent importuning, . . . following, . . . dogging, and . . . implied threat of physical touching," from "speech activities [such as my example of 'happy speech'] that are most unlikely to have those consequences," *ante,* at 724. Well. That may work for "oral protest"; but it is beyond imagining why "education" and "counseling" are especially *likely,* rather than especially *unlikely,* to involve such conduct. (Socrates *was* something of a *noodge,* but even he did not go *that* far.) *Unless,* of course, "education" and "counseling" are code words for efforts to dissuade women from abortion—in which event the statute would not be viewpoint neutral, which the Court concedes makes it invalid.

*supra,* at 794 (opinion of SCALIA, J.) (emphasis deleted). A restriction that operates only on speech that communicates a message of protest, education, or counseling presents exactly this risk. When applied, as it is here, at the entrance to medical facilities, it is a means of impeding speech against abortion. The Court's confident assurance that the statute poses no special threat to First Amendment freedoms because it applies alike to "used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries," *ante,* at 723, is a wonderful replication (except for its lack of sarcasm) of Anatole France's observation that "[t]he law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges . . . ." J. Bartlett, Familiar Quotations 550 (16th ed. 1992). This Colorado law is no more targeted at used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries than French vagrancy law was targeted at the rich. We know what the Colorado legislators, by their careful selection of content ("protest, education, and counseling"), were taking aim at, for they set it forth in the statute itself: the "right to protest or counsel *against* certain medical procedures" on the sidewalks and streets surrounding health care facilities. Colo. Rev. Stat. § 18–9–122(1) (1999) (emphasis added).

The Court is unpersuasive in its attempt to equate the present restriction with content-neutral regulation of demonstrations and picketing—as one may immediately suspect from the opinion's wildly expansive definitions of demonstrations as "'public display[s] of sentiment for or against a person or cause,'" and of picketing as an effort "'to persuade or otherwise influence.'" *Ante,* at 721–722, quoting Webster's Third New International Dictionary 600, 1710 (1993). (On these terms, Nathan Hale was a demonstrator and Patrick Henry a picket.) When the government regulates "picketing," or "demonstrating," it restricts a particular manner of expression that is, as the author of today's opinion has several times explained, "'a mixture of conduct and commu-

nication.'" *Frisby* v. *Schultz*, 487 U. S. 474, 497 (1988) (STEVENS, J., dissenting), quoting *NLRB* v. *Retail Store Employees*, 447 U. S. 607, 618–619 (1980) (STEVENS, J., concurring in part and concurring in result). The latter opinion quoted approvingly Justice Douglas's statement:

> "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation." *Bakery Drivers* v. *Wohl*, 315 U. S. 769, 776–777 (1942) (concurring opinion).

As JUSTICE STEVENS went on to explain, "no doubt the principal reason why handbills containing the same message are so much less effective than labor picketing is that the former depend entirely on the persuasive force of the idea." *Retail Store Employees, supra,* at 619. Today, of course, JUSTICE STEVENS gives us an opinion restricting not only handbilling but even one-on-one conversation of a particular content. There comes a point—and the Court's opinion today passes it—at which the regulation of action intimately and unavoidably connected with traditional speech is a regulation of speech itself. The strictures of the First Amendment cannot be avoided by regulating the act of moving one's lips; and they cannot be avoided by regulating the act of extending one's arm to deliver a handbill, or peacefully approaching in order to speak. All of these acts can be regulated, to be sure; but not, on the basis of content, without satisfying the requirements of our strict-scrutiny First Amendment jurisprudence.

Even with regard to picketing, of course, we have applied strict scrutiny to content-based restrictions. See *Carey,* 447 U. S., at 461 (applying strict scrutiny to, and invalidating, an Illinois statute that made "permissibility of residential

picketing . . . dependent solely on the nature of the message being conveyed"). As discussed above, the prohibition here *is* content based: Those who wish to speak for purposes other than protest, counsel, or education may do so at close range without the listener's consent, while those who wish to speak for other purposes may not. This bears no resemblance to a blanket prohibition of picketing—unless, of course, one uses the fanciful definition of picketing ("an effort to persuade or otherwise influence") newly discovered by today's opinion. As for the Court's appeal to the fact that we often "examine the content of a communication" to determine whether it "constitutes a threat, blackmail, an agreement to fix prices, a copyright violation, a public offering of securities, or an offer to sell goods," *ante*, at 721, the distinction is almost too obvious to bear mention: Speech of a certain content is constitutionally proscribable. The Court has not yet taken the step of consigning "protest, education, and counseling" to that category.

Finally, the Court is not correct in its assertion that the restriction here is content neutral because it is *"justified* without reference to the content of regulated speech," in the sense that "the State's interests in protecting access and privacy, and providing the police with clear guidelines, are unrelated to the content of the demonstrators' speech." *Ante*, at 719–720 (emphasis added). That is not an accurate statement of our law. The Court makes too much of the statement in *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), that "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.*, at 791, quoted *ante*, at 719. That is indeed "the *principal* inquiry"—suppression of uncongenial ideas is the worst offense against the First Amendment—but it is not the *only* inquiry. Even a law that has as its purpose something unrelated to the suppression of particular content cannot irrationally single out that content for its prohibition.

An ordinance directed at the suppression of noise (and therefore "justified without reference to the content of regulated speech") cannot be applied only to sound trucks delivering messages of "protest." Our very first use of the "justified by reference to content" language made clear that it is a prohibition *in addition to*, rather than in place of, the prohibition of facially content-based restrictions. "Selective exclusions from a public forum," we said, "may not be based on content alone, *and* may not be justified by reference to content alone." *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972) (emphasis added).

But in any event, if one accepts the Court's description of the interest served by this regulation, it is clear that the regulation is *both* based on content *and* justified by reference to content. Constitutionally proscribable "secondary effects" of speech are directly addressed in subsection (2) of the statute, which makes it unlawful to obstruct, hinder, impede, or block access to a health care facility—a prohibition broad enough to include all physical threats and all physically threatening approaches. The purpose of subsection (3), however (according to the Court), is to protect "[t]he unwilling listener's interest in avoiding unwanted communication," *ante*, at 716. On this analysis, Colorado has restricted certain categories of speech—protest, counseling, and education—out of an apparent belief that only speech with this content is sufficiently likely to be annoying or upsetting as to require consent before it may be engaged in at close range. It is reasonable enough to conclude that even the most gentle and peaceful close approach by a so-called "sidewalk counselor"—who wishes to "educate" the woman entering an abortion clinic about the nature of the procedure, to "counsel" against it and in favor of other alternatives, and perhaps even (though less likely if the approach is to be successful) to "protest" her taking of a human life—will often, indeed usually, have what might be termed the "secondary effect" of annoying or deeply upsetting the woman who is planning

the abortion. *But that is not an effect which occurs "without reference to the content" of the speech.* This singling out of presumptively "unwelcome" communications fits precisely the description of prohibited regulation set forth in *Boos* v. *Barry,* 485 U. S. 312, 321 (1988): It "targets the *direct impact* of a particular category of speech, not a secondary feature that happens to be associated with that type of speech." (Emphasis added.[2])

In sum, it blinks reality to regard this statute, in its application to oral communications, as anything other than a content-based restriction upon speech in the public forum. As such, it must survive that stringent mode of constitutional analysis our cases refer to as "strict scrutiny," which requires that the restriction be narrowly tailored to serve a compelling state interest. See *United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 813 (2000); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 45 (1983). Since the Court does not even attempt to support the regulation under this standard, I shall discuss it only briefly. Suffice it to say that if protecting people from un-

---

[2] The Court's contention that the statute is content neutral because it is not a "'regulation of speech'" but a "regulation of the places where some speech may occur," *ante,* at 719 (quoting *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989)), is simply baffling. First, because the proposition that a restriction upon the places where speech may occur is not a restriction upon speech is both absurd and contradicted by innumerable cases. See, *e. g., Madsen* v. *Women's Health Center, Inc.,* 512 U. S. 753 (1994); *Burson* v. *Freeman,* 504 U. S. 191 (1992); *Frisby* v. *Schultz,* 487 U. S. 474 (1988); *Boos* v. *Barry,* 485 U. S. 312 (1988); *Heffron* v. *International Soc. for Krishna Consciousness, Inc.,* 452 U. S. 640 (1981); *Carey* v. *Brown,* 447 U. S. 455 (1980); *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972). And second, because the fact that a restriction is framed as a "regulation of the places where some speech may occur" has nothing whatever to do with whether the restriction is content neutral—which is why *Boos* held to be content based the ban on displaying, within 500 feet of foreign embassies, banners designed to "'bring into public odium any foreign government.'" 485 U. S., at 316.

welcome communications (the governmental interest the Court posits) is a compelling state interest, the First Amendment is a dead letter. And if (as I shall discuss at greater length below) forbidding peaceful, nonthreatening, but uninvited speech from a distance closer than eight feet is a "narrowly tailored" means of preventing the obstruction of entrance to medical facilities (the governmental interest the State asserts), narrow tailoring must refer not to the standards of Versace, but to those of Omar the tentmaker. In the last analysis all of this does not matter, however, since as I proceed to discuss neither the restrictions upon oral communications nor those upon handbilling can withstand a proper application of even the less demanding scrutiny we apply to truly content-neutral regulations of speech in a traditional public forum.

## II

As the Court explains, under our precedents even a content-neutral, time, place, and manner restriction must be narrowly tailored to advance a significant state interest, and must leave open ample alternative means of communication. *Ward,* 491 U. S., at 802. It cannot be sustained if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Id.,* at 799.

This requires us to determine, first, what *is* the significant interest the State seeks to advance? Here there appears to be a bit of a disagreement between the State of Colorado (which should know) and the Court (which is eager to speculate). Colorado has identified in the text of the statute itself the interest it sought to advance: to ensure that the State's citizens may "obtain medical counseling and treatment in an unobstructed manner" by "preventing the willful obstruction of a person's access to medical counseling and treatment at a health care facility." Colo. Rev. Stat. § 18–9–122(1) (1999). In its brief here, the State repeatedly confirms the interest squarely identified in the statute under review. See, *e. g.,* Brief for Respondents 15 ("Each provision of the statute was

chosen to precisely address crowding and physical intimidation: conduct shown to impede access, endanger safety and health, and strangle effective law enforcement"); *id.,* at 14 ("[T]his provision narrowly addresses the conduct shown to interfere with access through crowding and physical threats"). The Court nevertheless concludes that the Colorado provision is narrowly tailored to serve . . . *the State's interest in protecting its citizens' rights to be let alone from unwanted speech.*

Indeed, the situation is even more bizarre than that. The interest that the Court makes the linchpin of its analysis was not only unasserted by the State; it is not only completely *different* from the interest that the statute specifically sets forth; it was explicitly *disclaimed* by the State in its brief before this Court, and characterized as a "straw interest" *petitioners* served up in the hope of discrediting the State's case. *Id.,* at 25, n. 19. We may thus add to the lengthening list of "firsts" generated by this Court's relentlessly proabortion jurisprudence, the first case in which, in order to sustain a statute, the Court has relied upon a governmental interest not only unasserted by the State, but positively repudiated.

I shall discuss below the obvious invalidity of this statute assuming, first (in Part A), the fictitious state interest that the Court has invented, and then (in Part B), the interest actually recited in the statute and asserted by counsel for Colorado.

## A

It is not without reason that Colorado claimed that, in attributing to this statute the false purpose of protecting citizens' right to be let alone, petitioners were seeking to discredit it. Just three Terms ago, in upholding an injunction against antiabortion activities, the Court refused to rely on any supposed " 'right of the people approaching and entering the facilities to be left alone.' " *Schenck* v. *Pro-Choice Network of Western N. Y.,* 519 U. S. 357, 383 (1997). It expressed "doubt" that this " 'right' . . . accurately reflects our

First Amendment jurisprudence." *Ibid.* Finding itself in something of a jam (the State here has passed a regulation that is obviously not narrowly tailored to advance any *other* interest), the Court today neatly repackages the repudiated "right" as an "interest" the State may decide to protect, *ante,* at 717, n. 24, and then places it onto the scales opposite the right to free speech in a traditional public forum.

To support the legitimacy of its self-invented state interest, the Court relies upon a *bon mot* in a 1928 dissent (which we evidently overlooked in *Schenck*). It characterizes the "unwilling listener's interest in avoiding unwanted communication" as an "aspect of the broader 'right to be let alone'" Justice Brandeis coined in his dissent in *Olmstead* v. *United States,* 277 U. S. 438, 478. The amusing feature is that even this slim reed contradicts rather than supports the Court's position. The right to be let alone that Justice Brandeis identified was a right the Constitution "conferred, *as against the government";* it was *that* right, not some generalized "common-law right" or "interest" to be free from hearing the unwanted opinions of one's fellow citizens, which he called the "most comprehensive" and "most valued by civilized men." *Ibid.* (emphasis added). To the extent that there can be gleaned from our cases a "right to be let alone" in the sense that Justice Brandeis intended, it is the right of the *speaker* in the public forum to be free from government interference of the sort Colorado has imposed here.

In any event, the Court's attempt to disguise the "right to be let alone" as a "governmental interest in protecting the right to be let alone" is unavailing for the simple reason that this is not an interest that may be legitimately weighed against the speakers' First Amendment rights (which the Court demotes to the status of First Amendment "interests," *ante,* at 714). We have consistently held that "the Constitution does not *permit* government to decide which types of otherwise protected speech are sufficiently offensive to require protection *for the unwilling listener or viewer.*" *Erz-*

*noznik* v. *Jacksonville*, 422 U. S. 205, 210 (1975) (emphasis added). And as recently as in *Schenck*, the Court reiterated that "[a]s a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." 519 U. S., at 383 (internal quotation marks omitted).

The Court nonetheless purports to derive from our cases a principle limiting the protection the Constitution affords the speaker's right to direct "offensive messages" at "unwilling" audiences in the public forum. *Ante*, at 716. There is no such principle. We have upheld limitations on a speaker's exercise of his right to speak on the public streets *when that speech intrudes into the privacy of the home*. *Frisby*, 487 U. S., at 483, upheld a content-neutral municipal ordinance prohibiting picketing outside a residence or dwelling. The ordinance, we concluded, was justified by, and narrowly tailored to advance, the government's interest in the "protection of residential privacy." *Id.*, at 484. Our opinion rested upon the "unique nature of the home"; "the home," we said, "is different." *Ibid.* The reasoning of the case plainly assumed the *nonexistence* of the right—common law or otherwise—that the Court relies on today, the right to be free from unwanted speech when on the public streets and sidewalks. The home, we noted, was "'the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits.'" *Ibid.* (quoting *Carey*, 447 U. S., at 471). The limitation on a speaker's right to bombard the home with unwanted messages which we approved in *Frisby*—and in *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970), upon which the Court also relies—was predicated on the fact that "'we are often 'captives' *outside* the sanctuary of the home and subject to objectionable speech.'" *Frisby*, *supra*, at 484 (quoting *Rowan*, *supra*, at 738) (emphasis added). As the universally understood state of First Amendment law is described in a leading treatise: "Outside

the home, the burden is generally on the observer or listener to avert his eyes or plug his ears against the verbal assaults, lurid advertisements, tawdry books and magazines, and other 'offensive' intrusions which increasingly attend urban life." L. Tribe, American Constitutional Law § 12–19, p. 948 (2d ed. 1988). The Court today elevates the abortion clinic to the status of the home.[3]

There is apparently no end to the distortion of our First Amendment law that the Court is willing to endure in order to sustain this restriction upon the free speech of abortion opponents. The labor movement, in particular, has good cause for alarm in the Court's extensive reliance upon *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184 (1921), an opinion in which the Court held that the Clayton Act's prohibition of injunctions against lawful and peaceful labor picketing did not forbid the injunction in that particular case. The First Amendment was not at issue, and was not so much as mentioned in the opinion, so the case is scant authority for the point the Court wishes to make. The case is also irrelevant because it was "clear from the evidence that from the outset, violent methods were pursued from time to time in such a way as to characterize the attitude of the picketers as continuously threatening." *Id.*, at 200. No such finding was made, or could be made, here. More importantly, however, as far as our future labor cases

---

[3] I do not disagree with the Court that "our cases have repeatedly recognized the interests of unwilling listeners" in locations, such as public conveyances, where "'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure,'" *ante*, at 718 (quoting *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 209 (1975)). But we have never made the absurd suggestion that a pedestrian is a "captive" of the speaker who seeks to address him on the public sidewalks, where he may simply walk quickly by. *Erznoznik* itself, of course, *invalidated* a prohibition on the showing of films containing nudity on screens visible from the street, noting that "the burden normally falls upon the viewer to 'avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" *Id.*, at 210–211 (quoting *Cohen* v. *California*, 403 U. S. 15, 21 (1971).

are concerned: If a "right to be free" from "persistence, importunity, following and dogging," *id.*, at 204, short of actual intimidation, was part of our infant First Amendment law in 1921, I am shocked to think that it is there today. The Court's assertion that "[n]one of our decisions has minimized the enduring importance of 'a right to be free' from persistent 'importunity, following and dogging' after an offer to communicate has been declined," *ante*, at 718, is belied by the fact that this passage from *American Steel Foundries* has never—not once—found its way into any of the many First Amendment cases this Court has decided since 1921. We will have cause to regret today's injection of this irrelevant anachronism into the mainstream of our First Amendment jurisprudence.

Of course even if one accepted the *American Steel Foundries* dictum as an accurate expression of First Amendment law, the statute here is plainly not narrowly tailored to protect the interest that dictum describes. Preserving the "right to be free" from "persisten[t] importunity, following and dogging" does not remotely require imposing upon all speakers who wish to protest, educate, or counsel a duty to request permission to approach closer than eight feet. The only way the narrow-tailoring objection can be eliminated is to posit a state-created, First-Amendment-trumping "right to be let alone" as broad and undefined as Brandeis's *Olmstead* dictum, which may well (why not, if the Court wishes it?) embrace a right not to be spoken to without permission from a distance closer than eight feet. Nothing stands in the way of *that* solution to the narrow-tailoring problem— except, of course, its utter absurdity, which is no obstacle in abortion cases.

## B

I turn now to the real state interest at issue here—the one set forth in the statute and asserted in Colorado's brief: the preservation of unimpeded access to health care facilities. We need look no further than subsection (2) of the statute to

see what a provision would look like that is narrowly tailored to serve *that* interest. Under the terms of that subsection, any person who "knowingly obstructs, detains, hinders, impedes, or blocks another person's entry to or exit from a health care facility" is subject to criminal and civil liability. It is possible, I suppose, that subsection (2) of the Colorado statute will leave unrestricted some expressive activity that, if engaged in from within eight feet, may be sufficiently harassing as to have the effect of impeding access to health care facilities. In subsection (3), however, the State of Colorado has prohibited a vast amount of speech that cannot possibly be thought to correspond to that evil.

To begin with, the 8-foot buffer zone attaches to *every* person on the public way or sidewalk within 100 feet of the entrance of a medical facility, regardless of whether that person is seeking to enter or exit the facility. In fact, the State acknowledged at oral argument that the buffer zone would attach to any person within 100 feet of the entrance door of a skyscraper in which a single doctor occupied an office on the 18th floor. Tr. of Oral Arg. 41. And even with respect to those who *are* seeking to enter or exit the facilities, the statute does not protect them only from speech that is so intimidating or threatening as to impede access. Rather, it covers *all* unconsented-to approaches for the purpose of oral protest, education, or counseling (including those made for the purpose of the most peaceful appeals) and, perhaps even more significantly, *every* approach made for the purposes of leafletting or handbilling, which we have never considered, standing alone, obstructive or unduly intrusive. The sweep of this prohibition is breathtaking.

The Court makes no attempt to justify on the facts this blatant violation of the narrow-tailoring principle. Instead, it flirts with the creation of yet a new constitutional "first" designed for abortion cases: "[W]hen," it says, "a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even

though it is not the least restrictive or least intrusive means of serving the statutory goal." *Ante,* at 726. The implication is that the availability of alternative means of communication permits the imposition of the speech restriction upon more individuals, or more types of communication, than narrow tailoring would otherwise demand. The Court assures us that "we have emphasized" this proposition "on more than one occasion," *ibid.* The only citation the Court provides, however, says no such thing. *Ward* v. *Rock Against Racism,* 491 U. S., at 798, quoted *ante,* at 726, n. 32, says only that narrow tailoring is not synonymous with "least restrictive" alternative. It does not at all suggest—and to my knowledge no other case does either—that narrow tailoring can be relaxed when there are other speech alternatives.

The burdens this law imposes upon the right to speak are substantial, despite an attempt to minimize them that is not even embarrassed to make the suggestion that they might actually "assist . . . the speakers' efforts to communicate their messages," *ante,* at 727. (Compare this with the Court's statement in a nonabortion case, joined by the author of today's opinion: "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 790–791 (1988).) The Court displays a willful ignorance of the type and nature of communication affected by the statute's restrictions. It seriously asserts, for example, that the 8-foot zone allows a speaker to communicate at a "normal conversational distance," *ante,* at 726–727. I have certainly held conversations at a distance of eight feet seated in the quiet of my chambers, but I have never walked along the public sidewalk—and have not seen others do so—"conversing" at an 8-foot remove. The suggestion is absurd. So is the suggestion that the opponents of abortion can take comfort in the fact that the statute "places no limitation on the number of speakers or the noise level, including the use of amplification

equipment," *ante,* at 726. That is good enough, I suppose, for "protesting"; but the Court must know that most of the "counseling" and "educating" likely to take place outside a health care facility cannot be done at a distance and at a high-decibel level. The availability of a powerful amplification system will be of little help to the woman who hopes to forge, in the last moments before another of her sex is to have an abortion, a bond of concern and intimacy that might enable her to persuade the woman to change her mind and heart. The counselor may wish to walk alongside and to say, sympathetically and as softly as the circumstances allow, something like: "My dear, I know what you are going through. I've been through it myself. You're not alone and you do not have to do this. There are other alternatives. Will you let me help you? May I show you a picture of what your child looks like at this stage of her human development?" The Court would have us believe that this can be done effectively—yea, perhaps even *more* effectively—by shouting through a bullhorn at a distance of eight feet.

The Court seems prepared, if only for a moment, see *ante,* at 727–728, to take seriously the magnitude of the burden the statute imposes on simple handbilling and leafletting. That concern is fleeting, however, since it is promptly assuaged by the realization that a leafletter may, without violating the statute, stand "near the path" of oncoming pedestrians and make his "proffe[r] . . . , which the pedestrians can easily accept," *ante,* at 727. It does not take a veteran labor organizer to recognize—although surely any would, see Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 7–8—that leafletting will be rendered utterly ineffectual by a requirement that the leafletter obtain from each subject permission to approach, or else man a stationary post (one that does not obstruct access to the facility, lest he violate subsection (2) of statute) and wait for passersby voluntarily to approach an outstretched hand. That simply is not how it is done, and the

Court knows it—or should. A leafletter, whether he is working on behalf of Operation Rescue, Local 109, or Bubba's Bar-B-Que, stakes out the best piece of real estate he can, and then walks a few steps toward individuals passing in his vicinity, extending his arm and making it *as easy as possible* for the passerby, whose natural inclination is generally not to seek out such distributions, to simply accept the offering. Few pedestrians are likely to give their "consent" to the approach of a handbiller (indeed, by the time he requested it they would likely have passed by), and even fewer are likely to walk over in order to pick up a leaflet. In the abortion context, therefore, ordinary handbilling, which we have in other contexts recognized to be a "classic for[m] of speech that lie[s] at the heart of the First Amendment," *Schenck*, 519 U. S., at 377, will in its most effective locations be rendered futile, the Court's implausible assertions to the contrary notwithstanding.

The Colorado provision differs in one fundamental respect from the "content-neutral" time, place, and manner restrictions the Court has previously upheld. Each of them rested upon a necessary connection between the regulated expression and the evil the challenged regulation sought to eliminate. So, for instance, in *Ward* v. *Rock Against Racism*, the Court approved the city's control over sound amplification because every occasion of amplified sound presented the evil of excessive noise and distortion disturbing the areas surrounding the public forum. The regulation we upheld in *Ward*, rather than "ban[ning] all concerts, or even all rock concerts, . . . instead focus[ed] on the source of the evils the city seeks to eliminate . . . and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." 491 U. S., at 799, n. 7. In *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 808 (1984), the Court approved a prohibition on signs attached to utility poles which "did no more than eliminate the exact source of

the evil it sought to remedy." In *Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640, 652 (1981), the Court upheld a regulation prohibiting the sale or distribution on the state fairgrounds of any merchandise, including printed or written material, except from a fixed location, because that precisely served the State's interest in "avoiding congestion and maintaining the orderly movement of fair patrons on the fairgrounds."

In contrast to the laws approved in those cases, the law before us here enacts a broad prophylactic restriction which does not "respon[d] precisely to the substantive problem which legitimately concern[ed]" the State, *Vincent, supra,* at 810—namely (the only problem asserted by Colorado), the obstruction of access to health facilities. Such prophylactic restrictions in the First Amendment context—even when they are content neutral—are not permissible. "Broad prophylactic rules in the area of free expression are suspect. . . . Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP* v. *Button*, 371 U. S. 415, 438 (1963). In *United States* v. *Grace*, 461 U. S. 171 (1983), we declined to uphold a ban on certain expressive activity on the sidewalks surrounding the Supreme Court. The purpose of the restriction was the perfectly valid interest in security, just as the purpose of the restriction here is the perfectly valid interest in unobstructed access; and there, as here, the restriction furthered that interest—but it furthered it with insufficient precision and hence at excessive cost to the freedom of speech. There was, we said, "an insufficient nexus" between security and all the expressive activity that was banned, *id.,* at 181—just as here there is an insufficient nexus between the assurance of access and forbidding unconsented communications within eight feet.[4]

---

[4] The Court's suggestion, *ante,* at 730, that the restrictions imposed by the Colorado ban are unobjectionable because they "interfer[e] far less with a speaker's ability to communicate" than did the regulations involved

Compare with these venerable and consistent descriptions of our First Amendment law the defenses that the Court makes to the contention that the present statute is overbroad. (To be sure, the Court is assuming its own invented state interest—protection of the "right to be let alone"—rather than the interest that the statute describes, but even so the statements are extraordinary.) "The fact," the Court says, "that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance." *Ante*, at 730–731. That is true enough ordinarily, but it is *not* true with respect to restraints upon speech, which is what the doctrine of overbreadth is all about. (Of course it is also not true, thanks to one of the other proabortion "firsts" announced by the current Court, with respect to restrictions upon abortion, which—as our decision in *Stenberg* v. *Carhart, post*, p. 914, exemplifies—has been raised to First Amendment status, even as speech opposing abortion has been demoted from First Amendment status.) Again, the Court says that the overbreadth doctrine is not applicable because this law simply "does not 'ban' any signs, literature, or oral statements," but "merely regulates the places where communications may occur." *Ante*, at 731. I know of no precedent for the proposition that time, place, and manner restrictions are not subject to the doctrine of overbreadth. Our decision in *Grace, supra*, demonstrates the contrary: Restriction of speech on the sidewalks around

---

in *Frisby* v. *Schultz*, 487 U. S. 474 (1988), and *Heffron*, and in cases requiring "silence" outside of a hospital (by which I presume the Court means *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753 (1994)), misses the point of narrow-tailoring analysis. We do not compare restrictions on speech to some Platonic ideal of speech restrictiveness, or to each other. Rather, our First Amendment doctrine requires us to consider whether the regulation in question burdens substantially more speech than necessary to achieve *the particular interest* the government has identified and asserted. *Ward*, 491 U. S., at 799. In each of the instances the Court cites, we concluded that the challenged regulation contained the precision that our cases require and that Colorado's statute (which the Court itself calls "prophylactic," *ante*, at 729) manifestly lacks.

the Supreme Court was invalidated because it went further than the needs of security justified. Surely New York City cannot require a parade permit and a security bond for any individual who carries a sign on the sidewalks of Fifth Avenue.

The Court can derive no support for its approval of Colorado's overbroad prophylactic measure from our decision in *Schenck.* To be sure, there we rejected the argument that the court injunction on demonstrating within a fixed buffer zone around clinic entrances was unconstitutional because it banned even "'peaceful, nonobstructive demonstrations.'" 519 U. S., at 381. The Court upheld the injunction, however, only because the "District Court was entitled to conclude," "[b]ased on defendants' past conduct" and "the record in [that] case," that the specific defendants involved would, if permitted within the buffer zone, "continue to do what they had done before: aggressively follow and crowd individuals right up to the clinic door and then refuse to move, or purposefully mill around parking lot entrances in an effort to impede or block the progress of cars." *Id.*, at 381–382. It is one thing to assume, as in *Schenck,* that a prophylactic injunction is necessary when the specific targets of that measure have demonstrated an inability or unwillingness to engage in protected speech activity without also engaging in *conduct* that the Constitution clearly does not protect. It is something else to assume that *all* those who wish to speak outside health care facilities across the State will similarly abuse their rights if permitted to exercise them. The First Amendment stands as a bar to exactly this type of prophylactic legislation. I cannot improve upon the Court's conclusion in *Madsen* that "it is difficult, indeed, to justify a prohibition on *all* uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic. Absent evidence that the protesters' speech is independently

proscribable (*i. e.*, 'fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, this provision cannot stand." 512 U. S., at 774 (citation omitted).

The foregoing discussion of overbreadth was written before the Court, in responding to JUSTICE KENNEDY, abandoned any pretense at compliance with that doctrine, and acknowledged—indeed, boasted—that the statute it approves "takes a prophylactic approach," *ante*, at 729, and adopts "[a] bright-line prophylactic rule," *ibid.*[5] I scarcely know how to respond to such an unabashed repudiation of our First Amendment doctrine. Prophylaxis is the antithesis of narrow tailoring, as the previously quoted passage from *Button* makes clear ("Broad prophylactic rules in the area of free expression are suspect. . . . Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." 371 U. S., at 438). If the Court were going to make this concession, it could simply have dispensed with its earlier (unpersuasive) attempt to show that the statute *was* narrowly tailored. So one can add to the casualties of our whatever-it-takes proabortion jurisprudence the First Amendment doctrine of narrow tailoring and overbreadth. R. I. P.

\*     \*     \*

Before it effectively threw in the towel on the narrow-tailoring point, the Court asserted the importance of taking

---

[5] Of course the Court greatly understates the scope of the prophylaxis, saying that "the statute's prophylactic aspect is justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior," *ante*, at 729. But the statute prevents the "physically harassing" act of (shudder!) approaching within closer than eight feet not only when it is directed against pregnant women, but also (just to be safe) when it is directed against 300-pound, male, and unpregnant truck drivers—surely a distinction that is not "difficult to make accurately," *ibid.*

into account "'the place to which the regulations apply in determining whether these restrictions burden more speech than necessary.'" *Ante,* at 728 (quoting *Madsen, supra,* at 772). A proper regard for the "place" involved in this case should result in, if anything, a commitment by this Court to adhere to and rigorously enforce our speech-protective standards. The public forum involved here—the public spaces outside of health care facilities—has become, by necessity and by virtue of this Court's decisions, a forum of last resort for those who oppose abortion. The possibility of limiting abortion by legislative means—even abortion of a live-and-kicking child that is almost entirely out of the womb—has been rendered impossible by our decisions from *Roe* v. *Wade,* 410 U. S. 113 (1973), to *Stenberg* v. *Carhart, post,* p. 914. For those who share an abiding moral or religious conviction (or, for that matter, simply a biological appreciation) that abortion is the taking of a human life, there is no option but to persuade women, one by one, not to make that choice. And as a general matter, the most effective place, if not the only place, where that persuasion can occur is outside the entrances to abortion facilities. By upholding these restrictions on speech in this place the Court ratifies the State's attempt to make even that task an impossible one.

Those whose concern is for the physical safety and security of clinic patients, workers, and doctors should take no comfort from today's decision. Individuals or groups intent on bullying or frightening women out of an abortion, or doctors out of performing that procedure, will not be deterred by Colorado's statute; bullhorns and screaming from eight feet away will serve their purposes well. But those who would accomplish their moral and religious objectives by peaceful and civil means, by trying to persuade individual women of the rightness of their cause, will be deterred; and that is not a good thing in a democracy. This Court once recognized, as the Framers surely did, that the freedom to speak and persuade is inseparable from, and antecedent to, the survival

of self-government. The Court today rotates that essential safety valve on our democracy one-half turn to the right, and no one who seeks safe access to health care facilities in Colorado or elsewhere should feel that her security has by this decision been enhanced.

It is interesting to compare the present decision, which *upholds* an utterly bizarre proabortion "request to approach" provision of Colorado law, with *Stenberg, post,* p. 914, also announced today, which *strikes down* a live-birth abortion prohibition adopted by 30 States and twice passed by both Houses of Congress (though vetoed both times by the President). The present case disregards the State's own assertion of the purpose of its proabortion law, and posits instead a purpose that the Court believes will be more likely to render the law *constitutional*. *Stenberg* rejects the State's assertion of the very meaning of its antiabortion law, and declares instead a meaning that will render the law *un*constitutional. The present case *rejects* overbreadth challenges to a proabortion law that regulates speech, on grounds that have no support in our prior jurisprudence and that instead amount to a total repudiation of the doctrine of overbreadth. *Stenberg applies* overbreadth analysis to an antiabortion law that has nothing to do with speech, even though until eight years ago overbreadth was unquestionably the exclusive preserve of the First Amendment. See *Janklow* v. *Planned Parenthood, Sioux Falls Clinic,* 517 U. S. 1174, 1177–1181 (1996) (SCALIA, J., dissenting from denial of certiorari); *Ada* v. *Guam Soc. of Obstetricians & Gynecologists,* 506 U. S. 1011, 1013 (1992) (SCALIA, J., dissenting from denial of certiorari).

Does the deck seem stacked? You bet. As I have suggested throughout this opinion, today's decision is not an isolated distortion of our traditional constitutional principles, but is one of many aggressively proabortion novelties announced by the Court in recent years. See, *e. g., Madsen* v. *Women's Health Center, Inc.,* 512 U. S. 753 (1994); *Schenck*

v. *Pro-Choice Network of Western N. Y.*, 519 U. S. 357 (1997); *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747 (1986). Today's distortions, however, are particularly blatant. Restrictive views of the First Amendment that have been in dissent since the 1930's suddenly find themselves in the majority. "Uninhibited, robust, and wide open" debate is replaced by the power of the State to protect an unheard-of "right to be let alone" on the public streets. I dissent.

JUSTICE KENNEDY, dissenting.

The Court's holding contradicts more than a half century of well-established First Amendment principles. For the first time, the Court approves a law which bars a private citizen from passing a message, in a peaceful manner and on a profound moral issue, to a fellow citizen on a public sidewalk. If from this time forward the Court repeats its grave errors of analysis, we shall have no longer the proud tradition of free and open discourse in a public forum. In my view, JUSTICE SCALIA's First Amendment analysis is correct and mandates outright reversal. In addition to undermining established First Amendment principles, the Court's decision conflicts with the essence of the joint opinion in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). It seems appropriate in these circumstances to reinforce JUSTICE SCALIA's correct First Amendment conclusions and to set forth my own views.

I

The Court uses the framework of *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), for resolution of the case. The Court wields the categories of *Ward* so that what once were rules to protect speech now become rules to restrict it. This is twice unfortunate. The rules of *Ward* are diminished in value for later cases; and the *Ward* analysis ought not have been undertaken at all. To employ *Ward*'s com-

plete framework is a mistake at the outset, for *Ward* applies only if a statute is content neutral. Colorado's statute is a textbook example of a law which is content based.

## A

The statute makes it a criminal offense to "knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility." Colo. Rev. Stat. § 18–9–122(3) (1999). The law imposes content-based restrictions on speech by reason of the terms it uses, the categories it employs, and the conditions for its enforcement. It is content based, too, by its predictable and intended operation. Whether particular messages violate the statute is determined by their substance. The law is a prime example of a statute inviting screening and censoring of individual speech; and it is serious error to hold otherwise.

The Court errs in asserting the Colorado statute is no different from laws sustained as content neutral in earlier cases. The prohibitions against "picketing" and/or "leafleting" upheld in *Frisby* v. *Schultz*, 487 U. S. 474 (1988), *United States* v. *Grace*, 461 U. S. 171 (1983), and *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972), the Court says, see *ante*, at 722, and n. 30, are no different from the restrictions on "protest, education, or counseling" imposed by the Colorado statute. The parallel the Court sees does not exist. No examination of the content of a speaker's message is required to determine whether an individual is picketing, or distributing a leaflet, or impeding free access to a building. Under the Colorado enactment, however, the State must review content to determine whether a person has engaged in criminal "protest, education, or counseling." When a citizen

approaches another on the sidewalk in a disfavored-speech zone, an officer of the State must listen to what the speaker says. If, in the officer's judgment, the speaker's words stray too far toward "protest, education, or counseling"—the boundaries of which are far from clear—the officer may decide the speech has moved from the permissible to the criminal. The First Amendment does not give the government such power.

The statute is content based for an additional reason: It restricts speech on particular topics. Of course, the enactment restricts "oral protest, education, or counseling" on any subject; but a statute of broad application is not content neutral if its terms control the substance of a speaker's message. If oral protest, education, or counseling on every subject within an 8-foot zone present a danger to the public, the statute should apply to every building entrance in the State. It does not. It applies only to a special class of locations: entrances to buildings with health care facilities. We would close our eyes to reality were we to deny that "oral protest, education, or counseling" outside the entrances to medical facilities concern a narrow range of topics—indeed, one topic in particular. By confining the law's application to the specific locations where the prohibited discourse occurs, the State has made a content-based determination. The Court ought to so acknowledge. Clever content-based restrictions are no less offensive than censoring on the basis of content. See, e. g., *United States* v. *Eichman,* 496 U. S. 310 (1990). If, just a few decades ago, a State with a history of enforcing racial discrimination had enacted a statute like this one, regulating "oral protest, education, or counseling" within 100 feet of the entrance to any lunch counter, our predecessors would not have hesitated to hold it was content based or viewpoint based. It should be a profound disappointment to defenders of the First Amendment that the Court today refuses to apply the same structural analysis when the speech involved is less palatable to it.

The Court, in error and irony, validates the Colorado statute because it purports to restrict all of the proscribed expressive activity regardless of the subject. The evenhandedness the Court finds so satisfying, however, is but a disguise for a glaring First Amendment violation. The Court, by citing the breadth of the statute, cannot escape the conclusion that its categories are nonetheless content based. The liberty of a society is measured in part by what its citizens are free to discuss among themselves. Colorado's scheme of disfavored-speech zones on public streets and sidewalks, and the Court's opinion validating them, are antithetical to our entire First Amendment tradition. To say that one citizen can approach another to ask the time or the weather forecast or the directions to Main Street but not to initiate discussion on one of the most basic moral and political issues in all of contemporary discourse, a question touching profound ideas in philosophy and theology, is an astonishing view of the First Amendment. For the majority to examine the statute under rules applicable to content-neutral regulations is an affront to First Amendment teachings.

After the Court errs in finding the statute content neutral, it compounds the mistake by finding the law viewpoint neutral. Viewpoint-based rules are invidious speech restrictions, yet the Court approves this one. The purpose and design of the statute—as everyone ought to know and as its own defenders urge in attempted justification—are to restrict speakers on one side of the debate: those who protest abortions. The statute applies only to medical facilities, a convenient yet obvious mask for the legislature's true purpose and for the prohibition's true effect. One need read no further than the statute's preamble to remove any doubt about the question. The Colorado Legislature sought to restrict "a person's right to protest or counsel against certain medical procedures." Colo. Rev. Stat. § 18–9–122(1) (1999). The word "against" reveals the legislature's desire to restrict

discourse on one side of the issue regarding "certain medical procedures." The testimony to the Colorado Legislature consisted, almost in its entirety, of debates and controversies with respect to abortion, a point the majority acknowledges. *Ante,* at 715. The legislature's purpose to restrict unpopular speech should be beyond dispute.

The statute's operation reflects its objective. Under the most reasonable interpretation of Colorado's law, if a speaker approaches a fellow citizen within any one of Colorado's thousands of disfavored-speech zones and chants in praise of the Supreme Court and its abortion decisions, I should think there is neither protest, nor education, nor counseling. If the opposite message is communicated, however, a prosecution to punish protest is warranted. The antispeech distinction also pertains if a citizen approaches a public official visiting a health care facility to make a point in favor of abortion rights. If she says, "Good job, Governor," there is no violation; if she says, "Shame on you, Governor," there is. Furthermore, if the speaker addresses a woman who is considering an abortion and says, "Please take just a moment to read these brochures and call our support line to talk with women who have been in your situation," the speaker would face criminal penalties for counseling. Yet if the speaker simply says, "We are for abortion rights," I should think this is neither education nor counseling. Thus does the Court today ensure its own decisions can be praised but not condemned. Thus does it restrict speech designed to teach that the exercise of a constitutional right is not necessarily concomitant with making a sound moral choice. Nothing in our law or our enviable free speech tradition sustains this self-serving rule. Colorado is now allowed to punish speech because of its content and viewpoint.

The Court time and again has held content-based or viewpoint-based regulations to be presumptively invalid. See *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S. 334, 345–346 (1995); *R. A. V.* v. *St. Paul,* 505 U. S. 377, 382 (1992);

*Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991) (" 'Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment' " (quoting *Regan* v. *Time, Inc.*, 468 U. S. 641, 648–649 (1984))). Here the statute "suppresses expression out of concern for its likely communicative impact." *Eichman*, 496 U. S., at 317. Like the picketing statute struck down in *Boos* v. *Barry*, 485 U. S. 312 (1998), this prohibition seeks to eliminate public discourse on an entire subject and topic. The Court can cite not a single case where we sustained a law aimed at a broad class of topics on grounds that it is both content and viewpoint neutral. Cf. *McIntyre* v. *Ohio Elections Comm'n, supra,* at 345 ("[E]ven though this provision applies evenhandedly to advocates of differing viewpoints, it is a direct regulation of the content of speech"); *Boos, supra,* at 319 ("[A] regulation that 'does not favor either side of a political controversy' is nonetheless impermissible because the 'First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic' " (quoting *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537 (1980))); see also *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 784–785 (1978) (invalidating statute which permitted corporations to speak on political issues decided by referenda, but not on other subjects). Statutes which impose content-based or viewpoint-based restrictions are subjected to exacting scrutiny. The State has failed to sustain its burden of proving that its statute is content and viewpoint neutral. See *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"). The *Ward* time, place, and manner analysis is simply inapplicable to this law. I would hold the statute invalid from the very start.

## B

In a further glaring departure from precedent we learn today that citizens have a right to avoid unpopular speech in a public forum. *Ante*, at 716–717. For reasons JUSTICE SCALIA explains in convincing fashion, neither Justice Brandeis' dissenting opinion in *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928), nor the Court's opinion in *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184 (1921), establishes a right to be free from unwelcome expression aired by a fellow citizen in a traditional public forum: "The Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views." *Edwards* v. *South Carolina*, 372 U. S. 229, 237 (1963).

The Court's reliance on *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970), and *Erznoznik* v. *Jacksonville*, 422 U. S. 205 (1975), is inapt. *Rowan* involved a federal statute allowing individuals to remove their names from commercial mailing lists. Businesses contended the statute infringed upon their First Amendment right to communicate with private citizens. The Court rejected the challenge, reasoning that the First Amendment affords individuals some control over what, and how often, unwelcome commercial messages enter their private residences. 397 U. S., at 736, 738. *Rowan* did not hold, contrary to statements in today's opinion, see *ante*, at 718, that the First Amendment permits the government to restrict private speech in a public forum. Indeed, the Court in *Rowan* recognized what everyone, before today, understood to be true: "[W]e are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound . . . ." 397 U. S., at 738.

In *Erznoznik*, the Court struck down a municipal ordinance prohibiting drive-in movie theaters visible from either a public street or a public place from showing films containing nudity. The ordinance, the Court concluded, imposed a content-based restriction upon speech and was both too

broad and too narrow to serve the interests asserted by the municipality. 422 U. S., at 211–215. The law, moreover, was not analogous to the rare, "selective restrictions" on speech previously upheld to protect individual privacy. *Id.,* at 208–209 (citing and discussing *Rowan, supra,* and *Lehman* v. *Shaker Heights,* 418 U. S. 298 (1974)). The Court did not, contrary to the majority's assertions, suggest that government is free to enact categorical measures restricting traditional, peaceful communications among citizens in a public forum. Instead, the Court admonished that citizens usually bear the burden of disregarding unwelcome messages. 422 U. S., at 211 (citing *Cohen* v. *California,* 403 U. S. 15, 21 (1971)).

Today's decision is an unprecedented departure from this Court's teachings respecting unpopular speech in public fora.

## II

The Colorado statute offends settled First Amendment principles in another fundamental respect. It violates the constitutional prohibitions against vague or overly broad criminal statutes regulating speech. The enactment's fatal ambiguities are multiple and interact to create further imprecisions. The result is a law more vague and overly broad than any criminal statute the Court has sustained as a permissible regulation of speech. The statute's imprecisions are so evident that this, too, ought to have ended the case without further discussion.

The law makes it a criminal offense to "knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility." Colo. Rev. Stat. § 18–9–122(3) (1999). The operative terms and phrases of the statute are not defined. The case comes

to us from the state court system; and as the Colorado courts did not give the statute a sufficient narrowing construction, questions of vagueness and overbreadth should be addressed by this Court in the first instance. See *Coates* v. *Cincinnati,* 402 U. S. 611, 613–614 (1971).

In the context of a law imposing criminal penalties for pure speech, "protest" is an imprecise word; "counseling" is an imprecise word; "education" is an imprecise word. No custom, tradition, or legal authority gives these terms the specificity required to sustain a criminal prohibition on speech. I simply disagree with the majority's estimation that it is "quite remote" that "anyone would not understand any of those common words." *Ante,* at 732. The criminal statute is subject to manipulation by police, prosecutors, and juries. Its substantial imprecisions will chill speech, so the statute violates the First Amendment. Cf. *Kolender* v. *Lawson,* 461 U. S. 352, 358, 360 (1983); *Herndon* v. *Lowry,* 301 U. S. 242, 263–264 (1937).

In operation the statute's inevitable arbitrary effects create vagueness problems of their own. The 8-foot no-approach zone is so unworkable it will chill speech. Assume persons are about to enter a building from different points and a protester is walking back and forth with a sign or attempting to hand out leaflets. If she stops to create the 8-foot zone for one pedestrian, she cannot reach other persons with her message; yet if she moves to maintain the 8-foot zone while trying to talk to one patron she may move knowingly closer to a patron attempting to enter the facility from a different direction. In addition, the statute requires a citizen to give affirmative consent before the exhibitor of a sign or the bearer of a leaflet can approach. When dealing with strangers walking fast toward a building's entrance, there is a middle ground of ambiguous answers and mixed signals in which misinterpretation can subject a good-faith speaker to criminal liability. The mere failure to give a reaction, for instance, is a failure to give consent. These ele-

ments of ambiguity compound the others. Finally, as we all know, the identity or enterprise of the occupants of a building which fronts on a public street is not always known to the public. Health care providers may occupy but a single office in a large building. The Colorado citizen may walk from a disfavored-speech zone to a free zone with little or no ability to discern when one ends and the other begins. The statute's vagueness thus becomes as well one source of its overbreadth. The only sure way to avoid violating the law is to refrain from picketing, leafletting, or oral advocacy altogether. Scienter cannot save so vague a statute as this.

A statute is vague when the conduct it forbids is not ascertainable. See *Chicago* v. *Morales*, 527 U. S. 41, 56 (1999). "[People] of common intelligence cannot be required to guess at the meaning of the enactment." *Winters* v. *New York*, 333 U. S. 507, 515 (1948). The terms "oral protest, education, or counseling" are at least as imprecise as criminal prohibitions on speech the Court has declared void for vagueness in past decades. In *Coates* v. *Cincinnati*, 402 U. S. 611 (1971), the Court encountered little difficulty in striking down a municipal ordinance making it a criminal offense for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by . . . ." *Ibid.* The Court held the ordinance to be unconstitutionally vague because "it subject[ed] the exercise of the right of assembly to an unascertainable standard, and [was] unconstitutionally broad because it authorize[d] the punishment of constitutionally protected conduct." *Id.,* at 614. Vagueness led to overbreadth as well in *Houston* v. *Hill*, 482 U. S. 451 (1987), where the Court invalidated an ordinance making it "'unlawful for any person to . . . in any manner oppose . . . or interrupt any policeman in the execution of his duty.'" *Id.,* at 455. The "sweeping" restriction, the Court reasoned, placed citizens at risk of arrest for exercising their

"freedom . . . to oppose or challenge police action," a right "by which we distinguish a free nation from a police state." *Id.*, at 462–463.

The requirement of specificity for statutes that impose criminal sanctions on public expression was established well before *Coates* and *Hill*, of course.   In *Carlson* v. *California*, 310 U. S. 106 (1940), a unanimous Court invalidated an ordinance prohibiting individuals from carrying or displaying any sign or banner or from picketing near a place of business "for the purpose of inducing or influencing, or attempting to induce or influence, any person to refrain from entering any such works, or factory, or place of business, or employment." *Id.*, at 109.   The statute employed imprecise language, providing citizens with no guidance as to whether particular expressive activities fell within its reach.   The Court found that the "sweeping and inexact terms of the ordinance disclose the threat to freedom of speech inherent in its existence," a result at odds with the guarantees of the First Amendment.   *Id.*, at 112.

Rather than adhere to this rule, the Court turns it on its head, stating the statute's overbreadth is "a virtue, not a vice." *Ante*, at 731.   The Court goes even further, praising the statute's "prophylactic approach; it forbids all unwelcome demonstrators to come closer than eight feet." *Ante*, at 729. Indeed, in the Court's view, "bright-line prophylactic rule[s] may be the best way to provide protection" to those individuals unwilling to hear a fellow citizen's message in a public forum. *Ibid.*   The Court is quite wrong.   Overbreadth is a constitutional flaw, not a saving feature.   Sweeping within its ambit even more protected speech does not save a criminal statute invalid in its essential reach and design.   The Court, moreover, cannot meet the concern that the statute is vague; for neither the Colorado courts nor established legal principles offer satisfactory guidance in interpreting the statute's imprecisions.

### III

Even aside from the erroneous, most disturbing assumptions that the statute is content neutral, viewpoint neutral, and neither vague nor overbroad, the Court falls into further serious error when it turns to the time, place, and manner rules set forth in *Ward*.

An essential requirement under *Ward* is that the regulation in question not "burden substantially more speech than is necessary to further the government's legitimate interests." 491 U. S., at 799. As we have seen, however, Colorado and the Court attempt to justify the law on just the opposite assumption.

I have explained already how the statute is a failed attempt to make the enactment appear content neutral, a disguise for the real concern of the legislation. The legislature may as well have enacted a statute subjecting "oral protest, education, or counseling near abortion clinics" to criminal penalty. Both the State and the Court attempt to sidestep the enactment's obvious content-based restriction by praising the statute's breadth, by telling us all topics of conversation, not just discourse on abortion, are banned within the statutory proscription. The saving feature the Court tries to grasp simply creates additional free speech infirmity. Our precedents do not permit content censoring to be cured by taking even more protected speech within a statute's reach. The statute before us, as construed by the majority, would do just that. If it indeed proscribes "oral protest, education, or counseling" on all subjects across the board, it by definition becomes "substantially broader than necessary to achieve the government's interest." *Id.*, at 800.

The whimsical, arbitrary nature of the statute's operation is further demonstration of a restriction upon more speech than necessary. The happenstance of a dental office being located in a building brings the restricted-speech zone into play. If the same building also houses an organization dedi-

cated, say, to environmental issues, a protest against the group's policies would be barred. Yet if, on the next block there were a public interest enterprise in a building with no health care facility, the speech would be unrestricted. The statute is a classic example of a proscription not narrowly tailored and resulting in restrictions of far more speech than necessary to achieve the legislature's object. The first time, place, and manner requirement of *Ward* cannot be satisfied.

Assuming Colorado enacted the statute to respond to incidents of disorderly and unlawful conduct near abortion clinics, there were alternatives to restricting speech. It is beyond dispute that pinching or shoving or hitting is a battery actionable under the criminal law and punishable as a crime. State courts have also found an actionable tort when there is a touching, done in an offensive manner, of an object closely identified with the body, even if it is not clothing or the body itself. See, *e. g., Fisher* v. *Carrousel Motor Hotel, Inc.*, 424 S. W. 2d 627, 630 (Tex. 1967) ("Personal indignity is the essence of an action for battery; and consequently the defendant is liable not only for contacts which do actual physical harm, but also for those which are offensive and insulting" (citing Prosser, Insult & Outrage, 44 Calif. L. Rev. 40 (1956))). The very statute before us, in its other parts, includes a provision aimed at ensuring access to health care facilities. The law imposes criminal sanctions upon any person who "knowingly obstructs, detains, hinders, impedes, or blocks another person's entry to or exit from a health care facility." Colo. Rev. Stat. § 18–9–122(2) (1999). With these means available to ensure access, the statute's overreaching in the regulation of speech becomes again apparent.

The majority insists the statute aims to protect distraught women who are embarrassed, vexed, or harassed as they attempt to enter abortion clinics. If these are punishable acts, they should be prohibited in those terms. In the course of praising Colorado's approach, the majority does not pause to tell us why, in its view, substantially less restrictive means

cannot be employed to ensure citizens access to health care facilities or to prevent physical contact between citizens. The Court's approach is at odds with the rigor demanded by *Ward.* See 491 U. S., at 799 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").

There are further errors in the Court's novel, prophylactic analysis. The prophylactic theory seems to be based on a supposition that most citizens approaching a health care facility are unwilling to listen to a fellow citizen's message and that face-to-face communications will lead to lawless behavior within the power of the State to punish. These premises have no support in law or in fact. And even when there is authority to adopt preventive measures, of course, the First Amendment does not allow a speech prohibition in an imprecise or overly broad statute. Cf. *Thornhill* v. *Alabama,* 310 U. S. 88, 105 (1940) ("The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted. But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter"). The Court places our free speech traditions in grave jeopardy by licensing legislatures to adopt "bright-line prophylactic rule[s] . . . to provide protection" to unwilling listeners in a quintessential public forum. *Ante,* at 729.

The Court's lack of concern with the statute's flaws is explained in part by its disregard of the importance of free discourse and the exchange of ideas in a traditional public forum. Our precedents have considered the level of protection afforded speech in specific locations, but the rules formulated in those decisions are not followed today. "To ascertain what limits, if any, may be placed on protected speech," our precedents instruct "we have often focused on

the 'place' of that speech, considering the nature of the forum the speaker seeks to employ. . . . [T]he standards by which limitations on speech must be evaluated 'differ depending on the character of the property at issue.'" *Frisby* v. *Schultz,* 487 U. S., at 479 (quoting *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 44 (1983)). The quoted language was part of our holding in an important free speech case; and it is a holding the majority disregards.

*Frisby* upheld a municipal ordinance restricting targeted picketing in residential areas. The primary purpose of the ordinance, and a reason the Court sustained it, was to protect and preserve the tranquility of private homes. The private location at which respondents sought to engage in their expressive activities was stressed throughout the Court's opinion. See 487 U. S., at 483 ("[W]e construe the ban to be a limited one; only focused picketing taking place solely in front of a particular residence is prohibited"). "Although in many locations," the Court reasoned, "we expect individuals simply to avoid speech they do not want to hear, the home is different. 'That we are often "captives" outside the sanctuary of the home and subject to objectionable speech . . . does not mean we must be captives everywhere.'" *Id.,* at 484 (quoting *Rowan* v. *Post Office Dept.,* 397 U. S., at 738).

The Colorado law does not seek to protect private residences. Nor does the enactment impose a place restriction upon expressive activity undertaken on property, such as fairgrounds, designated for limited, special purposes. See, *e. g., Heffron* v. *International Soc. for Krishna Consciousness, Inc.,* 452 U. S. 640, 655 (1981). The statute applies to public streets and sidewalks, traditional public fora which "'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" See *Boos,* 485 U. S., at 318 (quoting *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 515 (1939) (opinion of Roberts, J.)). Given our traditions with respect to open discussion in public fora, this statute,

which sweeps so largely on First Amendment freedoms, cannot be sustained.

The statute fails a further test under *Ward*, for it does not "'leave open ample alternative channels for communication of the information.'" 491 U. S., at 791 (quoting *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984)). *Frisby* again instructs us. A second reason we sustained the ordinance banning targeted residential picketing was because "ample alternativ[e]" avenues for communication remained open:

> "'Protestors have not been barred from the residential neighborhoods. They may enter such neighborhoods, alone or in groups, even marching. . . . They may go door-to-door to proselytize their views. They may distribute literature in this manner . . . or through the mails. They may contact residents by telephone, short of harassment.'" 487 U. S., at 483–484 (quoting Brief for Appellants in No. 87–168, O. T. 1987, pp. 41–42).

The residential picketing ordinance, the Court concluded, "permit[ted] the more general dissemination of a message" to the targeted audience. 487 U. S., at 483.

The same conclusion cannot be reached here. Door-to-door distributions or mass mailing or telephone campaigns are not effective alternative avenues of communication for petitioners. They want to engage in peaceful face-to-face communication with individuals the petitioners believe are about to commit a profound moral wrong. Without the ability to interact in person, however momentarily, with a clinic patron near the very place where a woman might elect to receive an abortion, the statute strips petitioners of using speech in the time, place, and manner most vital to the protected expression.

In addition to leaving petitioners without adequate means of communication, the law forecloses peaceful leafletting, a mode of speech with deep roots in our Nation's history and

traditions. In an age when vast resources and talents are commanded by a sophisticated media to shape opinions on limitless subjects and ideas, the distribution of leaflets on a sidewalk may seem a bit antiquated. This case proves the necessity for the traditional mode of speech. It must be remembered that the whole course of our free speech jurisprudence, sustaining the idea of open public discourse which is the hallmark of the American constitutional system, rests to a significant extent on cases involving picketing and leafletting. Our foundational First Amendment cases are based on the recognition that citizens, subject to rare exceptions, must be able to discuss issues, great or small, through the means of expression they deem best suited to their purpose. It is for the speaker, not the government, to choose the best means of expressing a message. "The First Amendment," our cases illustrate, "protects [citizens'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer* v. *Grant*, 486 U. S. 414, 424 (1988). The Court's conclusion that Colorado's 8-foot no-approach zone protects citizens' ability to leaflet or otherwise engage in peaceful protest is untenable.

Given the Court's holding, it is necessary to recall our cases protecting the right to protest and hand out leaflets. In *Lovell* v. *City of Griffin*, 303 U. S. 444 (1938), the Court invalidated an ordinance forbidding the distribution of literature of any kind without the written permission of a city official. "The liberty of the press," the Court explained, "is not confined to newspapers and periodicals." *Id.*, at 452. "It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Ibid.*

In *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147 (1939), reinforcing *Lovell*, the Court struck down a series of

municipal ordinances prohibiting the distribution of handbills on public streets on the rationale of preventing littering. *Schneider* made clear that while citizens may not enjoy a right to force an unwilling person to accept a leaflet, they do have a protected right to tender it. The Court stressed a basic First Amendment precept: "[T]he streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." 308 U. S., at 163. The words of the Court more than a half century ago demonstrate the necessity to adhere to those principles today:

"Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.

"This court has characterized the freedom of speech and that of the press as fundamental personal rights and

liberties. The phrase is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.

"In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." *Id.,* at 160–161 (footnote omitted).

After *Lovell* and *Schneider* the Court gave continued, explicit definition to our custom and practice of free and open discourse by picketing and leafletting. In *Thornhill* v. *Alabama,* 310 U. S. 88 (1940), the Court considered a First Amendment challenge to a statute prohibiting " '[l]oitering or picketing' " near " 'the premises or place of business of any . . . firm, corporation, or association of people, engaged in a lawful business.' " *Id.,* at 91. Petitioner was arrested, charged, and convicted of violating the statute by engaging in peaceful picketing in front of a manufacturing plant. *Id.,* at 94–95. The Court invalidated the Alabama statute. The breadth of Alabama's speech restriction was one reason for ruling it invalid on its face, just as it should be for the statute we consider today:

"[Alabama Code §] 3448 has been applied by the state courts so as to prohibit a single individual from walking

> slowly and peacefully back and forth on the public sidewalk in front of the premises of an employer, without speaking to anyone, carrying a sign or placard on a staff above his head stating only the fact that the employer did not employ union men affiliated with the American Federation of Labor; the purpose of the described activity was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." *Id.*, at 98–99 (footnote omitted).

The statute, in short, prohibited "whatever the means used to publicize the facts of a labor dispute, whether by printed sign, by pamphlet, by word of mouth or otherwise . . . so long as it occurs in the vicinity of the scene of the dispute." *Id.*, at 101.

The Court followed these observations with an explication of fundamental free speech principles I would have thought controlling in the present case:

> "It does not follow that the State in dealing with the evils arising from industrial disputes may impair the effective exercise of the right to discuss freely industrial relations which are matters of public concern. A contrary conclusion could be used to support abridgment of freedom of speech and of the press concerning almost every matter of importance to society.
>
> "The range of activities proscribed by § 3448, whether characterized as picketing or loitering or otherwise, embraces nearly every practicable, effective means whereby those interested—including the employees directly affected—may enlighten the public on the nature and causes of a labor dispute. The safeguarding of these means is essential to the securing of an informed and educated public opinion with respect to a matter which is of public concern. It may be that effective ex-

ercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests." *Id.*, at 104.

*Carlson* v. *California*, 310 U. S. 106 (1940), is in accord. In the course of reversing Carlson's conviction for engaging in a peaceful protest near a construction project in Shasta County, California, the Court declared that a citizen's right to "publiciz[e] the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by [the First Amendment through] the Fourteenth Amendment against abridgment by a State." *Id.*, at 113.

The principles explained in *Thornhill* and *Carlson* were reaffirmed a few years later in the context of speech on religious matters when an individual sought to advertise a meeting of the Jehovah's Witnesses by engaging in a door-to-door distribution of leaflets. *Martin* v. *City of Struthers*, 319 U. S. 141 (1943). The petitioner was convicted under a city ordinance which prohibited individuals from "distributing handbills, circulars or other advertisements" to private residences. *Id.*, at 142. The Court invalidated the ordinance, reinforcing the vital idea today's Court ignores:

"While door to door distributers of literature may be either a nuisance or a blind for criminal activities, they may also be useful members of society engaged in the

dissemination of ideas in accordance with the best tradition of free discussion. The widespread use of this method of communication by many groups espousing various causes attests its major importance. 'Pamphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people.'" *Id.*, at 145 (quoting *Schneider*, 308 U. S., at 164).

The Court's more recent precedents honor the same principles: Government cannot foreclose a traditional medium of expression. In *City of Ladue* v. *Gilleo*, 512 U. S. 43 (1994), we considered a challenge to a municipal ordinance prohibiting, *inter alia*, "such absolutely pivotal speech as [the display of] a sign protesting an imminent governmental decision to go to war." *Id.*, at 54. Respondent had placed a sign in a window of her home calling "For Peace in the Gulf." *Id.*, at 46. We invalidated the ordinance, finding that the local government "ha[d] almost completely foreclosed a venerable means of communication that is both unique and important." *Id.*, at 54. The opinion, which drew upon *Lovell, Martin,* and *Schneider,* was also careful to note the importance of the restriction on place imposed by the ordinance in question: "Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." 512 U. S., at 56. So, too, did we stress the importance of preserving the means citizens use to express messages bearing on important public debates. See *id.*, at 57 ("Residential signs are an unusually cheap and convenient form of communication[,] [e]specially for persons of modest means or limited mobility . . .").

A year later in *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995), we once more confirmed the privileged status peaceful leafletting enjoys in our free speech tradition. Ohio prohibited anonymous leafletting in connection with

election campaigns. Invalidating the law, we observed as follows: "'Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.'" *Id.*, at 341 (quoting *Talley* v. *California*, 362 U. S. 60, 64 (1960)). We rejected the State's claim that the restriction was needed to prevent fraud and libel in its election processes. Ohio had other laws in place to achieve these objectives. 514 U. S., at 350. The case, we concluded, rested upon fundamental free speech principles:

> "Indeed, the speech in which Mrs. McIntyre engaged— handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression. That this advocacy occurred in the heat of a controversial referendum vote only strengthens the protection afforded to Mrs. McIntyre's expression: Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed. No form of speech is entitled to greater constitutional protection than Mrs. McIntyre's." *Id.*, at 347 (citations omitted).

Petitioners commenced the present suit to challenge a statute preventing them from expressing their views on abortion through the same peaceful and vital methods approved in *Lovell, Schneider, Thornhill, Carlson,* and *McIntyre.* Laws punishing speech which protests the lawfulness or morality of the government's own policy are the essence of the tyrannical power the First Amendment guards against. We must remember that, by decree of this Court in discharging our duty to interpret the Constitution, any plea to the government to outlaw some abortions will be to no effect. See *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992). Absent the ability to ask the government to intervene, citizens who oppose abortion must seek to convince their fellow citizens of the moral imperative

of their cause. In a free society protest serves to produce stability, not to undermine it. "The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello* v. *Chicago*, 337 U. S. 1, 4 (1949). As Justice Brandeis observed: "[The Framers] recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form." *Whitney* v *California*, 274 U. S. 357, 375–376 (1927) (concurring opinion).

The means of expression at stake here are of controlling importance. Citizens desiring to impart messages to women considering abortions likely do not have resources to use the mainstream media for their message, much less resources to locate women contemplating the option of abortion. Lacking the aid of the government or the media, they seek to resort to the time honored method of leafletting and the display of signs. Nowhere is the speech more important than at the time and place where the act is about to occur. As the named plaintiff, Leila Jeanne Hill, explained, "I engage in a variety of activities designed to impart information to abortion-bound women and their friends and families. . . ." App. 49. "In my many years of sidewalk counseling I have seen a number of [these] women change their minds about aborting their unborn children as a result of my sidewalk counseling, and God's grace." *Id.*, at 51.

When a person is walking at a hurried pace to enter a building, a solicitor who must stand still eight feet away cannot know whether the person can be persuaded to accept the leaflet or not. Merely viewing a picture or brief message on the outside of the leaflet might be critical in the choice to receive it. To solicit by pamphlet is to tender it to the person. The statute ignores this fact. What the statute restricts is one person trying to communicate to another, which ought to be the heart of civilized discourse.

Colorado's excuse, and the Court's excuse, for the serious burden imposed upon the right to leaflet or to discuss is that it occurs at the wrong place. Again, Colorado and the Court have it just backwards. For these protesters the 100-foot zone in which young women enter a building is not just the last place where the message can be communicated. It likely is the only place. It is the location where the Court should expend its utmost effort to vindicate free speech, not to burden or suppress it.

Perhaps the leaflet will contain a picture of an unborn child, a picture the speaker thinks vital to the message. One of the arguments by the proponents of abortion, I had thought, was that a young woman might have been so uninformed that she did not know how to avoid pregnancy. The speakers in this case seek to ask the same uninformed woman, or indeed any woman who is considering an abortion, to understand and to contemplate the nature of the life she carries within her. To restrict the right of the speaker to hand her a leaflet, to hold a sign, or to speak quietly is for the Court to deny the neutrality that must be the first principle of the First Amendment. In this respect I am in full agreement with JUSTICE SCALIA's explanation of the insult the Court gives when it tells us these grave moral matters can be discussed just as well through a bullhorn. It would be remiss, moreover, not to observe the profound difference a leaflet can have in a woman's decisionmaking process.

Consider the account of one young woman who testified before the Colorado Senate:

> "Abortion is a major decision. Unfortunately, most women have to make this decision alone. I did and I know that I'm not the only one. As soon as I said the word 'pregnant,' he was history, never to be heard of, from again. I was scared and all alone. I was too embarrassed to ask for help. If this law had been in effect then, I would not have got any information at all and gone through with my abortion because the only people that were on my side were the people at the abortion clinic. They knew exactly how I was feeling and what to say to make it all better. In my heart, I knew abortion was wrong, but it didn't matter. I had never taken responsibility for my actions so why start then. One of the major reasons I did not go through with my scheduled abortion was a picture I was given while I was pregnant. This was the first time I had ever seen the other side of the story. I think I speak for a lot of women, myself included, when I say abortion is the only way out because of [sic] it's all I knew. In Sex Education, I was not taught about adoption or the fetus or anything like that. All I learned about was venereal diseases and abortion. The people supplying the pamphlet helped me make my choice. I got an informed decision, I got information from both sides, and I made an informed decision that my son and I could both live with. Because of this picture I was given, right there, this little boy got a chance at life that he would never have had." *Id.*, at 167–168.

There are, no doubt, women who would testify that abortion was necessary and unregretted. The point here is simply that speech makes a difference, as it must when acts of lasting significance and profound moral consequence are being contemplated. The majority reaches a contrary conclusion

only by disregarding settled free speech principles. In doing so it delivers a grave wound to the First Amendment as well as to the essential reasoning in the joint opinion in *Casey*, a concern to which I now turn.

## IV

In *Planned Parenthood of Southeastern Pa.* v. *Casey*, the Court reaffirmed its prior holding that the Constitution protects a woman's right to terminate her pregnancy in its early stages. The majority opinion in *Casey* considered the woman's liberty interest and principles of *stare decisis*, but took care to recognize the gravity of the personal decision: "[Abortion] is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted." 505 U. S., at 852.

The Court now strikes at the heart of the reasoned, careful balance I had believed was the basis for the opinion in *Casey*. The vital principle of the opinion was that in defined instances the woman's decision whether to abort her child was in its essence a moral one, a choice the State could not dictate. Foreclosed from using the machinery of government to ban abortions in early term, those who oppose it are remitted to debate the issue in its moral dimensions. In a cruel way, the Court today turns its back on that balance. It in effect tells us the moral debate is not so important after all and can be conducted just as well through a bullhorn from an 8-foot distance as it can through a peaceful, face-to-face exchange of a leaflet. The lack of care with which the Court sustains the Colorado statute reflects a most troubling abdication of our responsibility to enforce the First Amendment.

There runs through our First Amendment theory a concept of immediacy, the idea that thoughts and pleas and petitions must not be lost with the passage of time. In a fleeting existence we have but little time to find truth through discourse. No better illustration of the immediacy of speech, of the urgency of persuasion, of the preciousness of time, is presented than in this case. Here the citizens who claim First Amendment protection seek it for speech which, if it is to be effective, must take place at the very time and place a grievous moral wrong, in their view, is about to occur. The Court tears away from the protesters the guarantees of the First Amendment when they most need it. So committed is the Court to its course that it denies these protesters, in the face of what they consider to be one of life's gravest moral crises, even the opportunity to try to offer a fellow citizen a little pamphlet, a handheld paper seeking to reach a higher law.

I dissent.